MASSACHUSETTS FINANCIAL SERVICES, INC., Plaintiff,

v.

SECURITIES INVESTOR PROTECTION CORPORATION, Defendant.

CA 74–2008–T.

United States District Court, D. Massachusetts.

March 26, 1976.

412

Joseph P. Rooney, Daniel B. Bickford, Richard J. McCarthy, Gaston, Snow & Ely, Bartlett, Boston, Mass., for plaintiff.

William H. Seckinger, Wilfred R. Caron, Theodore H. Focht, Washington, D. C., for defendant.

OPINION

TAURO, District Judge.

This is an action in which Massachusetts Financial Services, Inc. (M.F.S.) is seeking a declaratory judgment on the question of whether it is a member of the federally-established Securities Investor Protection Corporation (S.I.P.C.). It also seeks to recover $5,368 paid to S.I.P.C. in response to S.I.P.C.'s mandatory assessment of M.F.S. for calendar years 1972 and 1973.[1]

Subject matter jurisdiction over both the declaratory and damage claims is based on section 27 of the Securities and Exchange Act of 1934, 15 U.S.C. § 78aa, as incorporated into the 1970 Securities Investor Protection Act, 15 U.S.C. § 78bbb. Venue is based on those same provisions. Alternatively, subject matter jurisdiction over the plaintiff's monetary claim is based on § 10 of the 1970 Act, 15 U.S.C. § 78jjj(a). Following the filing of cross-motions for summary judgment, the parties stipulated to all material facts, allowing this court to consider the case on the merits.

I.

S.I.P.C. is an independent corporation established by Congress in 1970 to protect investors from the effects of chronic instability in the securities industry.[2] In late 1969 and early 1970, the price of publicly-traded securities rapidly declined from the heights reached during

1. There is no dispute on the amount of M.F.S.'s assessment should it be found to be a member of S.I.P.C.

2. See Securities Investor Protection Corp. v. Barbour, 421 U.S. 412, 95 S.Ct. 1733, 44 L.Ed.2d 263 (1975); Securities and Exchange Commission v. Baroff Co., Inc., 497 F.2d 280 (2d Cir. 1974); Securities and Exchange Commission v. Aberdeen Securities Co., 480 F.2d 1121 (3rd Cir.), cert. denied, 414 U.S. 1111, 94 S.Ct. 841, 38 L.Ed.2d 738 (1973); Securities & Exchange Commission v. Alan F. Hughes, Inc., 461 F.2d 974 (2d Cir. 1972); Securities and Exchange Commission v. Salmon & Co., 375 F.Supp. 867 (S.D.N.Y.1974); Securities Investor Protection Corp. v. Charisma Securities Corp., 352 F.Supp. 302 (S.D.N.Y.1972).

the halcyon days only a few years before. During the decline, large numbers of institutional and individual investors left the markets, dramatically reducing daily trading volume and thereby drying up the commissions received by brokers and dealers on individual transactions. Persistent financial problems soon beset the securities industry, leading to voluntary liquidations, mergers, receiverships and bankruptcies of a significant number of brokerage houses. Such failures seriously endangered customers' funds which, in turn, led to further, albeit temporary, erosion of confidence and weakening of the industry.

Particularly vulnerable during this period, were the so-called "free credit balances" left in brokerage accounts by customers. This money, which can be withdrawn by the customer at any time, usually represents the proceeds of the sale of a customer's securities or customer's dividends paid directly to his brokerage. Customers with particularly active accounts leave these funds on deposit with the firm largely as a convenience so that they are readily available for the customer's next transaction. In the interim, however, the funds are available to the broker to maintain positions in securities, to finance margin purchases of other customers and for general operating expenses. Rarely, if ever, is interest paid on these funds.

Broker-dealers also hold substantial amounts of customer securities in safekeeping. Although customers have a right to receive these fully paid securities on demand, there is a risk that they may be improperly transferred or reached by creditors if the technical requirements of "segregation" are not complied with. Moreover, securities purchased by customers on margin are held by the broker and may be pledged as collateral on bank loans.

Prior to 1970, a variety of federal, state and industry regulations had been introduced to safeguard customer assets held by broker-dealers. Firms were required to register with the Securities and Exchange Commission, to maintain certain minimum capital requirements and to limit their aggregate indebtedness in relation to their net capital. Member firms of registered exchanges were required to furnish the customer credit balance statements, disclosing the amount owed the customer, and the fact that his funds are not segregated and may be used by the firm in its own business. Certain exchanges and the National Association of Securities Dealers required segregation and identification of customer securities. After 1964, the New York Stock Exchange and other exchanges established limited trust funds to protect the free credit balances held by member firms.

In 1970, however, as the market declined and brokerage liquidations and bankruptcies became more than isolated occurrences, it became apparent that existing legislation and industry self-regulation provided insufficient protection to customers. Between August and December, 1970, for example, three former members of the New York Stock Exchange were forced to close. But that Exchange refused to provide protection to customers of those firms, giving as its reason the exhaustion of available funds. The industry then turned to the federal government for assistance.[3]

Congress responded by enacting the Securities Investor Protection Act of 1970. This legislation established S.I.P.C. as a non-profit, independent corporation whose prime responsibility was to establish immediately a substantial reserve fund which would provide protection to investors in the event a brokerage firm collapsed, thereby reinstilling some confidence in the securities markets. The fund would be created and maintained through assessments from the members of S.I.P.C. Membership in the corporation, however, was made mandatory for brokers and dealers regis-

---

**3.** This discussion of the events giving rise to the enactment of the 1970 Act is based on the detailed analysis appearing in the Act's legislative history. *See* 1970 U.S.Code Cong. & Admin.News 5254–85.

tered under § 15 of the Securities and Exchange Act of 1934, 15 U.S.C. § 78o as well as certain categories of other members of national securities exchanges. Membership, therefore, is merely a device for determining who should contribute to the fund.[4]

The issue in this case is whether the plaintiff "qualified" for "membership" in the corporation and is thereby required to contribute to the S.I.P.C. reserve fund.

## II.

M.F.S. is a Massachusetts corporation organized in 1969. During its initial years, it performed no broker activities requiring registration as a broker or dealer with the Securities and Exchange Commission. It has been registered as an Investment Advisor, pursuant to the Investors Advisors Act of 1940, 15 U.S.C. § 80b–3 since its incorporation.

Until 1973, M.F.S. was organized into two divisions: an Investment Counsel Division and a Mutual Fund Division. The Investment Counsel Division has traditionally provided investment management and advice to clients whose funds and securities are held and transferred by third persons such as bank trustees or custodians. The Mutual Fund Division provides investment management services directly to six registered open-ended mutual funds. The shares of these funds were marketed by brokers and dealers having no affiliation with the plaintiff. Neither one of these functions are broker-dealer activities requiring registration. *See* CCH 1973–74 Fed.Sec.L.Rep. ¶ 79, 746 (February 20, 1974).

In November 1972 M.F.S. decided to expand its operations. It registered as a broker-dealer in December of that year and in early 1973 established a Sales Division for the purpose of marketing the shares of its mutual fund customers itself. No other Division of M.F.S. distributes securities and the sole business of the Sales Division is the distribution of the shares of these six mutual funds.

## III.

The prerequisites for S.I.P.C. membership are defined in ¶ 3(a)(2) of the Securities Investor Protection Act of 1970, 15 U.S.C. § 78ccc(a)(2). It provides for membership for:

> (A) all persons registered as brokers or dealers under section 78o(b) of this title [the registration provisions of the 1934 Act], and
>
> (B) all persons who are members of a national securities exchange,

other than persons whose business as a broker or dealer consists exclusively of (i) *the distribution of shares of registered open end investment companies or unit investment trusts,* (ii) the sale of variable annuities, (iii) the business of insurance, or (iv) the business of rendering investment advisory services to one or more registered investment companies or insurance company separate accounts; . . ., (emphasis added).

The plaintiff claims that its only business *as a broker-dealer* is the activity of its Sales Division. Since that business clearly falls within the exception of subparagraph (i), M.F.S. contends it cannot be considered a member of S.I.P.C. The defendant argues, however, that the words "as a broker or dealer" in the quoted language should be equated with the phrase "in the securities business." Under that view of the statute, the court should evaluate all aspects of M.F.S.'s business. Because some of its activities

---

**4.** The establishment of the S.I.P.C. fund is only one aspect of the corporation's responsibilities. In keeping with its responsibilities for the protection of customers, S.I.P.C. is required to maintain "an early warning system" to detect broker instability and, if necessary to oversee a brokerage's liquidation, all in the context of SEC supervision. *See generally Securities Investor Protection Corp. v. Barbour,* 421 U.S. 412, 95 S.Ct. 1733, 44 L.Ed.2d 263 (1975).

"in the securities business" go beyond the exceptions specified in the exceptions to S.I.P.C. membership, particularly the work of its Investment Division, M.F.S. should be considered a member of S.I.P.C.[5]

The question appears to be one of first impression. A careful reading of the statute, however, as well as an evaluation of its legislative history, support the plaintiff's position.

The terms "broker" and "dealer" are words of art, with a specific meaning both in the industry and to those members of Congress intimately involved in the drafting of securities legislation. Section 3(a)(4) of the 1934 Act, 15 U.S.C. § 78c(a)(4) defines a broker as

any person engaged in the business of effecting transactions in securities for the account of others, but does not include a bank.

Section 3(a)(5) of the 1934 Act, 15 U.S.C. § 78c(a)(5) defines a dealer as

any person engaged in the business of buying and selling securities for his own account, through a broker or otherwise, but does not include a bank, or any person insofar as he buys or sells securities for his own account either individually or in some fiduciary capacity, but not as a part of a regular business.

Both definitions connote a certain regularity of participation in securities transactions at key points in the chain of distribution. Yet, neither definition is all-encompassing. Each excludes, either explicitly or by implication, a variety of functions—commodities trading, various banking transactions—which under the defendant's view might be considered part of the "securities business" in a general sense. *See Henry C. Coppel & Co. d/b/a May-Pak Management Company*, CCH 1974 Sec.L.Rep. ¶ 79, 814 (May 13, 1974).

By incorporating these unambiguous and familiar terms into the 1970 Act, it seems manifest that Congress intended to place some limitations on membership in S.I.P.C. The members of the House Interstate and Foreign Commerce Committee and the Senate Banking and Currency Committee, were certainly familiar with earlier securities legislation emanating from those committees as well as with the general structure of the industry. If those committees, and eventually the entire Congress, had intended to broaden the membership of S.I.P.C. as the defendant claims, they could have done so without torturing terms which traditionally have had settled meanings in earlier legislation and the industry itself, and which have been incorporated by reference into the 1970 Act. 15 U.S.C. § 78bbb.

■ The statute's legislative history buttresses this interpretation. As both the House and Conference Reports indicate, the S.I.P.C. fund was established to deal with the specific problem: the risk to members of the investing public who found it necessary to leave assets on account with their brokers. The problem was one which did not involve the entire securities industry, but only brokerage houses which actually marketed securities for the investing public. And the matter came to Congressional attention only when serious declines in commission income raised the spectre of substantial numbers of brokerage failures. It seems logical, therefore, that membership in S.I.P.C. was limited to that phase of the

---

5. The nature of the Mutual Fund Division's activities is not clear. Specifically, in their stipulation, the parties have not indicated whether the investment management activities for M.F.S.'s mutual fund clients, the responsibilities plaintiff claims are those of the Mutual Fund Division, include the *providing* of investment *advice*. *See* Stipulation § 4. Even if the Mutual Fund Division does give investment advice to M.F.S.'s mutual fund clients, however, thereby making M.F.S. eligible for the exception listed in sub-paragraph (iv) as well as the exception listed in sub-paragraph (i), *the result in this case would be the same.* S.I.P.C. permits a firm to avoid membership by claiming multiple exceptions so long as its "activities as a broker or dealer" do not fall outside the exemptions specified in sub-paragraphs (i) through (iv). See Stipulation Exhibit 3, page 1.

industry where the risk was felt most directly. As noted in the House report accompanying the 1970 Act, the primary aim of the legislation was to "establish immediately a substantial reserve fund which will provide protection to customers of broker-dealers similar to that formerly provided by the exchange trust funds." 1970 U.S.Code Cong. & Admin. News 5257.

■ S.I.P.C.'s own dealings with the M.F.S. further support this interpretation. It did not demand assessments until M.F.S. had established dealer activities in late 1972. Yet, prior to that time, M.F.S.'s Investment Division had engaged "in the securities business" without any claim for dues on the part of S.I.P.C. and without falling within the exceptions listed in sub-paragraphs (i) through (iv). Surely if mere participation "in the securities business" in a manner not specified in sub-paragraphs (i) through (iv) was sufficient to trigger S.I.P.C. membership, it would seem logical that S.I.P.C. would have required M.F.S. to participate in the fund prior to its registration as a broker-dealer.[6]

The defendant argues, in response, that the primary objective of the Congress was to create a fund substantial enough to provide meaningful protection to investors' funds. The defendant has not shown, however, that a fund whose contributors are limited to those clearly specified in the legislation would not provide adequate insurance to customers in the event of actual brokerage failure or provide a sufficient psychological boost to industry confidence. Indeed, if the fund should become insufficient for the purposes of the Act, the S.E.C. may, under certain conditions, issue notes to the Secretary of the Treasury in an amount to one billion dollars, the proceeds of which then may be lent to S.I.P.C. 15 U.S.C. § 78ddd(g). *See Securi-*

*ties and Exchange Commission v. Guaranty Bond & Securities Corp.*, 496 F.2d 145, 147 n. 3 (6th Cir. 1974), *rev'd on other grounds sub. nom. Securities and Exchange Commission v. Barbour*, 421 U.S. 412, 95 S.Ct. 1733, 44 L.Ed.2d 263 (1975). Certainly, protection of this scope seems more than adequate for the forseeable future.

Accordingly, this court holds that M.F.S. is not a member of S.I.P.C. and that it is therefore not liable for assessments covering calendar years 1972 and 1973.

---

**6.** Of course, once a broker-dealer becomes a member of S.I.P.C., the amount of its assessment may be based on factors other than the amount of business it does as a broker-dealer. *See* 15 U.S.C. § 78ddd. This point seems to have been the source of some confusion during Senate Hearings on the proposals which evolved into the 1970 Act. *See* Defendant's Memorandum at 14–18; *Cf. SEC v. Aberdeen Securities Co., Inc.*, 480 F.2d 1121, 1123 (3rd Cir.), *cert. denied*, 414 U.S. 1111, 94 S.Ct. 841, 38 L.Ed.2d 738 (1973).