2013 UT 76

**LEGACY RESOURCES, INC., Appellant,**

v.

**LIBERTY PIONEER ENERGY SOURCE, INC., Daniel R. Gunnell, and Kimball E. Hodges, Appellees.**

No. 20120142.

Supreme Court of Utah.

Dec. 20, 2013.

Jefferson W. Gross, S. Ian Hiatt, Salt Lake City, for appellant.

Matthew L. Lalli, Christine R. Poleshuk, Salt Lake City, Alan Loewinsohn, R. Matthew Pittman, Dallas, TX, for appellees.

Justice LEE, opinion of the Court:

¶ 1 State and federal securities laws require a broker[1] of securities to register and secure a license. *See* UTAH CODE § 61–1–3; 15 U.S.C. § 78o(a)(1). Noncompliance triggers certain statutory penalties, including the one at the center of this case: Utah Code section 61–1–22(8), which provides that "[a] person who has made or engaged in the performance of any contract in violation of this chapter ... may not base a suit on the contract."

¶ 2 Legacy Resources, Inc. (Legacy) appeals from a decision dismissing its breach of contract and trade secret claims on summary judgment. The district court's decision rested on two key determinations: that Legacy violated the securities laws by acting as an unlicensed broker in recruiting investors on behalf of Liberty Pioneer Energy Source, Inc. (Liberty); and that its securities violations rendered its contracts unenforceable under Utah Code section 61–1–22(8).

¶ 3 We affirm in part and reverse in part. After clarifying the definition of "broker" under Utah Code section 61–1–3, and rejecting the availability of the equitable defenses put forward by Legacy as a ground for circumventing Utah Code section 61–1–22(8), we hold that the undisputed facts sustain the conclusion that Legacy acted as an unlicensed broker and that such violation foreclosed the enforcement of one of its contracts. We also conclude, however, that another of Legacy's contracts was not implicated by its securities violation, and thus that its claim under that contract—and by extension its trade secret claim—should have survived summary judgment.

## I. Background

¶ 4 Legacy was formed in 1998 to "pursue investments in the oil and gas business." To do so, it organized general partnerships, in which it functioned as managing general partner, and solicited funds from prospective investors (who became general partners upon investment) through private placement memoranda. By Legacy's sixth year of operation, it and its president and sole owner, Shawn Smart, had developed relationships with a number of investors, whose identities it allegedly maintained and guarded in its records.

¶ 5 At that time Daniel Gunnell, Kimball Hodges, and Bryan Farris—then principals of Liberty—approached Legacy, hoping it could help Liberty raise funds to take advantage of a prospective oil and gas project called Central Utah Lease Acquisition (CULA). Liberty reported that the project was a tremendous investment opportunity, but that it and its current investors lacked the funds necessary to take advantage of it. It accordingly asked Legacy to raise the funds Liberty needed, but requested that it do so quickly. Legacy declined, citing an inability to complete all the paperwork and other wrangling in the timeframe that Liberty described. Undeterred, Liberty suggested that Legacy act merely as a finder of investors instead. After some discussion and clarification, Legacy agreed. Liberty there-

---

1. The Utah statute speaks of a "broker-dealer," while the federal provision uses the terms "bro-ker or dealer." We use the shorthand "broker" to encompass both terms.

after prepared and the parties executed two documents, an agent agreement (AA) and a non-circumvention/disclosure agreement (NDA).

¶ 6 The AA obligated Legacy to "function as an independent agent actively introducing potential investors to [Liberty] regarding [CULA]." It also stated that "[c]ompensation paid [under the AA] is paid in consideration for [Legacy] successfully introducing investors to the projects." Thus, the parties agreed that Legacy would be paid 50 percent "of all cash, carry and interest derived by [Liberty] on a pro-rata basis from investors that are brought to [Liberty] by [Legacy's] efforts" and that "[s]uch compensation shall be based solely upon performance by [Legacy] and shall be in full satisfaction of [Legacy's] work on the [CULA] projects." The parties further agreed that, in performance of the contract, Legacy would "comply in all ... respects with the Securities Act ... and applicable state securities laws."

¶ 7 The NDA, on the other hand, stated in pertinent part only that the parties "agree not to circumvent, avoid, bypass, or obviate the other party directly or indirectly to avoid payment of fees in any transaction pending, or in the future." And it indicated their agreement to "keep totally confidential any and all information that is disclosed by the other party" and not to "disclose to any other person or entity any such information."

¶ 8 After executing these agreements, Legacy began to perform its obligations under the contracts, largely through the efforts of Smart. Smart communicated with pre-existing businesses and/or social contacts about CULA. During these conversations, he responded to inquiries his contacts had about CULA and often spoke about CULA at the same time as discussing these contacts' investments in Legacy's own projects. Smart also gave Liberty names, addresses, and phone numbers of potential investors from Legacy's "confidential" investors list. Though Smart did not conduct marketing events, prepare marketing documents, or prepare or have input on the terms of the private placement memoranda for CULA, he did have input and provide feedback on marketing brochures for the project.

¶ 9 Further, he offered his opinion on the merits of the project to some of these investors. Specifically, when asked if he "ever share[d] [his] opinion with prospective investors in connection with CULA, as part of ... performing [his] duties under the [AA]," or indicated "that [he] thought this was a good project," he responded, "I'm sure I did." In emails to potential investors that included marketing material about CULA, Smart stated "I think this is a very low-risk deal with huge upside potential." And, "[t]o the extent [he] knew anything" about geological data concerning the project," Smart "would tell" potential investors what he knew "if they asked," or offer to accompany investors to Liberty's offices to look at seismic data. On occasion, he relayed specific questions raised by investors to Liberty. He also occasionally accepted partially executed documents and checks made payable to Liberty from investors and delivered them to Liberty's offices. Finally, Legacy remained the primary point of contact regarding CULA for some investors, even after they had made an investment in the project.

¶ 10 As a result of these efforts, Liberty secured twenty-nine investors through Legacy. Those investors contributed 73 percent ($3.54 million) of the funds Liberty raised for the CULA projects. Liberty and its principals went on to promote at least fourteen other oil and gas projects and allegedly secured investments for these projects from investors introduced to Liberty by Legacy for the CULA projects. It also allegedly accepted investments from persons who were referred to Liberty by contacts and investors originally introduced by Legacy.

¶ 11 At some point, Legacy became suspicious that Liberty was using Legacy's investor information on other projects without Legacy's permission and without compensating Legacy, and Legacy sued. In its complaint, Legacy alleged breach of contract (both of the AA and of the NDA), violation of Utah's Uniform Trade Secret Act, unjust enrichment, and conversion. Specifically, Legacy alleged that the AA encompassed not just the CULA projects but future projects as well, and that Liberty breached that agreement by failing to pay commission on

subsequent projects and breached the NDA by using and disclosing to other parties Legacy's confidential investor information.

¶ 12 Liberty filed a motion for partial summary judgment, arguing that the AA and the NDA were unenforceable on grounds of illegality because they were performed in violation of the securities laws. In opposing that motion, Legacy filed an affidavit under Utah Rule of Civil Procedure 56(f), seeking a continuance on the basis of a need for additional discovery concerning Liberty's illegality defense—specifically, on whether Legacy had acted merely as a "finder" and on whether equitable considerations would preclude Liberty from avoiding the contract—and on whether Liberty had fully paid Legacy for amounts owed on the CULA project.

¶ 13 After oral argument, the district court granted Liberty's motion for partial summary judgment without addressing Legacy's 56(f) affidavit. In so doing, it rejected Legacy's assertion of a "finder's exception" under the securities laws, concluding that no such exception existed and thus finding Legacy in violation of the securities laws for acting as an unlicensed broker. On that basis, the district court also held that Legacy's securities violations rendered its contracts unenforceable as a matter of law. And it determined that Legacy's trade secret claim was obviated by the dismissal of the contract claims. Finally, as an alternative ground for dismissing Legacy's contract claims, the district court construed the contracts as obligating Liberty to pay commissions to Legacy on only the CULA projects.

¶ 14 Legacy now appeals. We review the summary judgment decision of the district court for correctness, according no deference to its analysis. *Orvis v. Johnson*, 2008 UT 2, ¶ 6, 177 P.3d 600.

¶ 15 We first address the propriety of the district court's grant of summary judgment on Legacy's breach of contract claims. We conclude that our securities laws precluded Legacy from enforcing the AA, but not the NDA. And because the NDA imposes confidentiality obligations on Liberty—not tied to any commission payment entitlement—we hold that the district court's determination that Liberty was not obligated to pay commissions for use of Legacy's investor information on subsequent projects was also insufficient to sustain dismissal of the NDA claim. We accordingly take up—and ultimately reject—the district court's dismissal of Legacy's trade secret claim. Finally, we find harmless the district court's failure to rule on Legacy's 56(f) request for additional discovery. Thus, we affirm with respect to Legacy's claim for breach of the AA, but reverse with respect to its claims for breach of the NDA and on its trade secret claim.

## II. Breach of Contract Claims

¶ 16 Legacy challenges the dismissal of its breach of contract claims on four grounds. It (a) asserts that there are disputed questions of fact on the question whether it acted as a broker; (b) claims that equitable considerations sustain the enforceability of its contracts even assuming its status as a broker; (c) challenges the determination that the NDA required or was performed using illegal activity; and (d) disputes the construction of the NDA limiting its right to compensation to the CULA projects.

¶ 17 We affirm the district court's determinations that Legacy acted as a broker and that the AA is unenforceable under our securities laws. We reverse the summary dismissal of the NDA claim, however, concluding that this agreement neither required nor was performed using illegal activity.

## A. Broker

¶ 18 The threshold questions before us concern (1) the legal definition of "broker" under the securities laws and, (2) Legacy's status as such. In the district court, these issues were framed in terms of a so-called "finder's exception"—specifically, whether the law encompassed such an exception and whether Legacy qualified for it. We find the "finder's exception" question unhelpful—or at least more distracting than enlightening.

¶ 19 The securities laws say nothing of finders, only of brokers. So the operative question is not whether Legacy qualifies for an exception as a *finder*, but only whether it is subject to regulation as a *broker*. Perhaps the notion of "finder" is meant only as the

*yin* to the "broker's" *yang*—as a shorthand label for those actors whose activities do not quite qualify them for regulation under the securities laws. But if so it is entirely circular—and more confusing than helpful—to ask about *finder* status if all we really mean by that is *non-broker* status. It is simpler and more straightforward to proceed straight to the question whether a given actor qualifies as a broker, which, after all, is the controlling statutory term. *Cf. Diversified Gen. Corp. v. White Barn Golf Course*, 584 P.2d 848, 852 (Utah 1978) (rejecting the notion of a finder's exception under provision regulating real estate brokers, Utah Code section 61–2–2, concluding that the "duties undertaken by plaintiff in [a] finder's agreement fall precisely within the statutory definition of a real estate broker").

¶ 20 Under Utah law a broker is "a person engaged in the business of effecting transactions in securities for the account of others or for the person's own account." UTAH CODE § 61–1–13(1)(c)(i). The federal definition is along the same lines. *See* 15 U.S.C. § 78c(a)(4)(A) (defining "broker" as "any person engaged in the business of effecting transactions in securities for the account of others"). The federal term has acquired a settled definition in the caselaw. We interpret the Utah statute to incorporate the same essential standard, both because our statute instructs us to "coordinate the interpretation and administration" of our securities law with "related federal regulation," UTAH CODE § 61–1–27, and because the text of our statute is generally in line with the federal standard. And we conclude that Legacy acted as a broker under these provisions under the undisputed facts in the record.

1. The Legal Definition of Broker

¶ 21 This court has not yet interpreted the term "broker" in our securities laws. But there is a developed body of federal caselaw in this field. The federal law notion of "broker" looks to a range of factors or considerations. Those factors are sometimes framed in terms of "regular participation in securities transactions, employment with the issuer of the securities, payment by commission as opposed to salary, history of selling the securities of other issuers, [and] involvement in advi[sing] ... investors and active[ly] recruit[ing]" them. *S.E.C. v. George*, 426 F.3d 786, 797 (6th Cir.2005). Alternatively, the federal factors are sometimes expressed in somewhat expanded terms of whether a person "1) is an employee of the issuer; 2) received commissions as opposed to a salary; 3) is selling, or previously sold, the securities of other issuers; 4) is involved in negotiations between the issuer and the investor; 5) makes valuations as to the merits of the investment or gives advice; and 6) is an active rather than passive finder of investors." *S.E.C. v. Martino*, 255 F.Supp.2d 268, 283 (S.D.N.Y.2003) (internal quotation marks omitted).[2]

¶ 22 Federal law does not frame this list of factors as exhaustive, *S.E.C. v. Benger*, 697 F.Supp.2d 932, 945 (N.D.Ill.2010), or flag any one consideration as universally dispositive. But two factors are widely considered to be most strongly indicative of broker status. *Kramer*, 778 F.Supp.2d at 1334.

¶ 23 First, "[t]ransaction-based compensation," i.e., payment on commission, is "one of the hallmarks of being a broker-dealer." *Cornhusker Energy Lexington, LLC v. Prospect St. Ventures*, No. 8:04CV586, 2006 WL 2620985, at *6 (D.Neb. Sept. 12, 2006).[3] This factor is rooted in

---

2. *See S.E.C. v. Kramer*, 778 F.Supp.2d 1320, 1334 (M.D.Fla.2011) (same); *see also Salamon v. CirTran Corp.*, 2:03–CV–787–TS, 2005 WL 3132343, at *2 (D.Utah Nov. 22, 2005) (listing the factors as "(1) whether the person receives transaction-based compensation, such as commissions or referral fees; (2) whether the person is involved in negotiations between the issuer and the investor; (3) whether the person makes valuations as to the merits of the investment or gives advice; and (4) whether the person is an active rather than passive finder of investors").

3. *See also Kramer*, 778 F.Supp.2d at 1334 ("[T]ransaction-based compensation is the hallmark of a salesman."); *Indus Partners, LLC v. Intelligroup, Inc.*, 77 Mass.App.Ct. 793, 934 N.E.2d 264, 269 (2010) ("In issuing 'No–Action' letters to market participants, the Securities and Exchange Commission (SEC) has found transaction-based fee arrangements to be 'key factors' in determining whether broker-dealer registration is required.").

"[t]he underlying concern" that "transaction-based compensation represents a potential incentive for abusive sales practices that registration is intended to regulate and prevent." *Id.* As the SEC puts it, "customer protection standards" are served when one with a "salesman's stake" in a securities transaction is required to register. 1st Global, Inc., S.E.C. No–Action Letter, 2001 WL 499080, at *14 (May 7, 2001).

¶ 24 Second, involvement "at key points in the chain [of] distribution" is a key indicator of broker activity. *See S.E.C. v. Bravata*, No. 09–12950, 2009 WL 2245649, at *2 (E.D.Mich. July 27, 2009).[4] Thus, a person who participates in advertising for clients, and receives and possesses client funds and securities, is thought to be engaged in "brokerage" conduct under federal law. *See S.E.C. v. Margolin*, No. 92 Civ. 6307(PKL), 1992 WL 279735, at *5 (S.D.N.Y. Sept. 30, 1992).

¶ 25 We interpret our Utah statute in a manner encompassing similar considerations. That conclusion derives in part from the state statutory directive that we "coordinate the interpretation and administration" of our securities law with "related federal regulation." UTAH CODE § 61–1–27. But this is an aspiration for coordination, not a prescription for incorporation of federal law.[5] So we must also consider the operative statutory text, to see if its terms are compatible with the federal standard.

¶ 26 We conclude that they are. The key statutory terms—defining "broker" as "a person engaged in the business of effecting transactions in securities," UTAH CODE § 61–1–13(1)(c)(i)—are in line with the above-quoted federal factors. A person who is "engaged" in something is "committed" or "employed, occupied, or busy." THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 591 (5th ed.2011).[6] Engagement in a "business," moreover, connotes active commitment to a regular or customary pursuit of a commercial activity, often for profit.[7] And one who is engaged in the business of "effecting" a securities transaction is one who is involved in "bring[ing it] about; mak[ing it] happen, caus[ing] or accomplish[ing it]." *Id.* at 569.[8]

---

4. *See also DeHuff v. Digital Ally, Inc.*, No. 3:08CV327TSL–JCS, 2009 WL 4908581, at *3 (S.D.Miss. Dec. 11, 2009) ("[A] person effects transactions in securities if he or she participates in such transactions at key points in the chain of distribution.") (internal quotation marks omitted); *Martino*, 255 F.Supp.2d at 283 (same); *Mass. Fin. Servs., Inc. v. Sec. Investor Prot. Corp.*, 411 F.Supp. 411, 415 (D.Mass.1976) (same).

5. *See State v. Larsen*, 865 P.2d 1355, 1360 (Utah 1993) (explaining that the statute's use of "coordinate" suggests that federal conformity is not mandated, particularly when read with the requirement that Utah law be "uniform" with the laws of other states); *see also Go2Net, Inc. v. FreeYellow.com, Inc.*, 158 Wash.2d 247, 143 P.3d 590, 595 (2006) (en banc) ("[T]his provision does not mean our courts must imitate the federal courts, however, only that in construing our state statute we must not interfere with the federal scheme." (internal quotation marks omitted)).

6. *See also* THE RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE 644 (2d ed.1983) (defining "engaged" as "busy or occupied; involved"); WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 751 (2002) (defining "engaged" as "occupied, employed").

7. THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 252 (5th ed.2011) (defining "business" as "[t]he activity of buying and selling commodi-

ties, products, or services," "[t]he amount or volume of this activity," "[t]he variety of this activity in which a person is engaged," "[a] specific occupation or pursuit," or "[a] commercial enterprise or establishment"); THE RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE 283 (2d ed.1983) (defining the term as "an occupation, profession, or trade" or "a person, partnership, or corporation engaged in commerce, manufacturing, or a service; profit-seeking enterprise or concern," "that with which a person is principally and seriously concerned"); WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 302 (2002) (defining "business" as "an activity engaged in as normal, logical, or inevitable and [usually] extending over a considerable period of time," "an activity engaged in toward an immediate specific end and [usually] extending over a limited period of time," or "a [usual] commercial or mercantile activity customarily engaged in as a means of livelihood and typically involving some independence of judgment and power of decision").

8. *See also* THE RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE 622 (2d ed.1983) ("to produce as an effect; bring about; accomplish; make happen"); WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 724 (2002) ("to cause to come into being" or "to bring about [especially] through successful use of factors contributory to the result").

¶ 27 All of these words inform the meaning of the operative term "broker," in a manner in line with the factors identified in the federal caselaw. The notion of "effecting" a securities transaction helps identify the relevant activities that bring such transactions to fruition—indicating that "broker" determinations appropriately focus on acts such as as involvement in negotiations between the issuer and investor, advice regarding the merits of an investment, and pursuit of investors. *See supra* ¶ 21. "Engagement" in securities transactions, in the sense of active commitment or occupation, suggests that brokers actively participate in these relevant activities, instead of standing by passively while they occur. And the notion of engagement in "business" recognizes that active involvement is most likely to take place in circumstances where the broker is engaged in commercial activity, typically for profit—such as in a circumstance where an individual receives compensation by commission or sells the securities of other issuers. *See supra* ¶¶ 22, 24.

■ ¶ 28 Thus, we interpret "broker" under Utah Code section 61–1–3 to incorporate the essential considerations set forth in federal law: A "broker" is one who is actively committed to or employed in the regular pursuit of bringing about a securities transaction, as evidenced by transaction-based compensation, the sale of securities of other issuers, involvement in negotiations between

issuer and investor, advice or valuation of the merits of an investment, and active pursuit of investors.[9]

## 2. Legacy's Status as a Broker

■ ¶ 29 Under this standard, Legacy easily qualifies as a broker on the basis of the undisputed facts in the record. It is undisputed that Legacy (1) accepted transaction-based compensation; (2) provided opinions regarding the merits of the project, calling it "a very low-risk deal with huge upside potential"; (3) actively recruited investors by emailing them marketing materials and/or traveling to meet with them; (4) participated in refining marketing materials;[10] (5) answered investor questions about the project (including questions about geographical information related to the project); (6) offered to accompany investors to Liberty's offices to look at seismic data; (7) occasionally accepted payment and other documents from investors for eventual delivery to Liberty; and (8) remained the primary contact for the projects for some investors, even after they had invested. *See supra* ¶¶ 6–9.

¶ 30 Legacy suggests that only the first two items[11] weigh in favor of broker status and that the facts in this case, as presented, "are insufficient to establish that a person acted as a broker (or a broker-dealer) as a matter of law." We disagree with both assertions.

9. There is one factor set forth in federal law that is somewhat more difficult to conceptualize as consistent with the statutory text—the consideration whether a person "is an employee of the issuer." *See supra* ¶ 22. Yet federal law is itself confused on the matter, with cases cutting in opposite directions on the question whether employment with the issuer cuts for or against a person's status as a broker. *Compare Kramer*, 778 F.Supp.2d at 1335 (listing "working as a consultant rather than an employee of the issuer" as a fact supporting the determination that a party acted as an unregistered broker), *with George*, 426 F.3d at 797 (suggesting that not being an employee of the issuer weighs against broker status). And the parties here have offered no basis for treating this factor as relevant to a person's broker status. So we decline, for now, to adopt this factor under our law, while reserving the right to reconsider the matter in the future.

10. Legacy attempts to manufacture a dispute on this point—which is based on an admission in

Smart's deposition—by pointing to a statement in Smart's affidavit that he did not *prepare* marketing materials. But preparing marketing materials and having input on marketing materials are not equivalent, so the statements are not in conflict. And even if they were, "when a party takes a clear position in a deposition, that is not modified on cross-examination, he may not thereafter raise an issue of fact by his own affidavit which contradicts his deposition, unless he can provide an explanation of the discrepancy." *Webster v. Sill*, 675 P.2d 1170, 1172–73 (Utah 1983). Smart's affidavit offered no such explanation, so we take as undisputed his deposition statement that he offered input on marketing materials.

11. Legacy suggests that not being employed by the issuer of the securities could weigh in favor of broker status, but we give that factor no weight in our analysis. *See supra* n. 9.

¶ 31 All of the activities listed above—and not just the first two—illustrate that Legacy was involved in the securities transactions at issue "at key points in the chain of distribution." *See Martino,* 255 F.Supp.2d at 283 (internal quotation marks omitted). Legacy's interaction with investors ranged from initial contact straight through to document execution and ultimate payment. Legacy did more than "merely act[ ] as a finder in bringing together the parties to transactions involving the purchase and sale of securities." *Cornhusker,* 2006 WL 2620985, at *6 (internal quotation marks omitted). In its meetings and correspondence with potential investors, Legacy sought to influence investors' decisions, both directly, by offering opinion, marketing material, and other information, and indirectly, by providing input and feedback on CULA marketing materials. In this way, Legacy did not simply introduce investors to Liberty's marketing agent who in turn lobbied for an investment; it functioned, at least in a limited way, as Liberty's marketing agent. *See DeHuff v. Digital Ally, Inc.,* No. 3:08CV327TSL–JCS, 2009 WL 4908581, at *4–5 (S.D.Miss. Dec. 11, 2009) (denying summary judgment where evidence supported the idea that the party at issue did not market the securities, but merely introduced the investors to a marketing agent).[12] It also functioned as the go-between for Liberty and potential investors by procuring answers from Liberty to specific questions posed by investors, accepting documents and checks from investors for delivery to Liberty, and acting as the primary contact person with investors about CULA even after they invested. *See supra* ¶¶ 6–7.

¶ 32 Legacy's efforts were geared toward effecting an investment, not just initiating a business contact. It was, after all, only after an actual investment was made that Legacy received a commission, the mark of a salesman with a personal stake in the outcome.

Together, all of these actions are sufficient to sustain the district court's conclusion that Legacy acted as a broker.[13]

¶ 33 None of the cases that Legacy cites persuades us otherwise. It may be, as Legacy suggests, that many courts have declined to decide broker status on summary judgment. But if so that is only a reflection of the facts and circumstances of the cited cases, not a rule foreclosing summary judgment in this field. *See, e.g., S.E.C. v. Sky Way Global, LLC,* No. 8:09–cv–455–T–23TBM, 2010 WL 5058509, at *2 (M.D.Fla. Dec. 6, 2010) (denying summary judgment where "the parties present[ed] both conflicting evidence as to material factual issues and certain, persuasive grounds for doubting the admissibility of at least some of the proffered evidence"). Where undisputed facts support the determination that a person acted as a broker, summary judgment is not only appropriate but required. *See George,* 426 F.3d at 797 (deciding broker question on summary judgment); *S.E.C. v. Milan Capital Grp., Inc.,* No. 00CIV.108(DLC), 2000 WL 1682761, at *8 (S.D.N.Y. Nov. 9, 2000) (same); *S.E.C. v. Zubkis,* No. 97CIV8086JGK, 2000 WL 218393, at *12 (S.D.N.Y. Feb. 23, 2000) (same).

¶ 34 Legacy cites *Salamon v. Teleplus Enters.,* No. 05–2058(WHW), 2008 WL 2277094, at *13 (D.N.J. June 2, 2008), for the proposition that the "distinction drawn between the broker and the finder or middleman is that the latter bring[s] the parties together with no involvement on [his] part in negotiating the price or any of the other terms of the transaction." (Alterations in original) (internal quotation marks omitted). But a lack of involvement in price-negotiation is not dispositive. Under the statute, a broker is one who "engage[s] in the business of effecting transactions in securities," not one who par-

---

**12.** *See also Indus Partners,* 934 N.E.2d at 270–71 (concluding that a party acted as a broker because it did "far more than serve as a passive conduit between brokers and investors").

**13.** True, Liberty did not produce undisputed evidence that Legacy analyzed the needs of CULA, recommended or designed financing methods, or negotiated the price or terms of the securities— considerations that in Legacy's view weigh in

favor of mere "finder" status. *See Cornhusker,* 2006 WL 2620985, at *6 (D.Neb. Sept. 12, 2006) (listing these as actions that SEC No-Action letters have determined transformed a finder into a broker). But these are not the only activities that turn a finder into a broker, and the undisputed considerations cited above are sufficient to render Legacy a broker.

ticipates in negotiations between the investor and the issuer. *See supra* ¶ 20. The statutory definition broadly considers a wide range of involvement in a securities transaction, with participation in price-negotiation being just one piece of the puzzle. In some cases negotiation activity may be the linchpin that secures broker status. But the absence of such activity is not controlling, particularly in a case like this one where other considerations tip the scales in favor of broker status.

¶ 35 We accordingly affirm the district court's conclusion that Legacy acted as an unregistered, unlicensed broker in violation of both state and federal securities law.

### B. Illegality

¶ 36 Even assuming the unlawfulness of its activity as an unlicensed broker, Legacy alternatively challenges the district court's invocation of Utah Code section 61–1–22(8), a provision foreclosing "[a] person who has made or engaged in the performance of any contract" in violation of the securities law from "bas[ing] a suit on the contract." Specifically, Legacy asserts that certain "equitable considerations" militate against application of this provision, and finds error in the district court's failure to credit those considerations. In addition, Legacy argues that section 61–1–22(8) is not implicated by the NDA because neither the terms of the NDA nor Legacy's performance thereunder require illegal activity, even if the same cannot be said of the AA. We reject Legacy's first point, but agree with the second.

### 1. The AA and Equitable Considerations

■ ¶ 37 In Legacy's view, both state and federal law allow courts to consider "additional and equitable factors"—specifically, waiver, estoppel, and in pari delicto-type defenses—before they invalidate a contract based on violations of the securities laws. We disagree. Whether or not such an inqui-

ry is permissible under federal law (a question we need not and do not reach), our state statute leaves no room for the equitable inquiry advanced by Legacy.

¶ 38 The governing Utah statute unequivocally prohibits an unlicensed broker from enforcing a contract performed in violation of our securities laws. *See* UTAH CODE § 61–1–22(8) ("A person who has . . . engaged in the performance of any contract in violation of this chapter . . . may not base a suit on the contract."). The broad, categorical terms of this provision leave no room for "equitable considerations" preventing Liberty from invoking its protections.

¶ 39 Legacy portrays section 61–1–22(8) as a codification of "the general and common law rule that an unlicensed person may not maintain an action for recovery on account of services for which a license was required." [14] And it insists that we have never applied such rule "unconditionally," *see George v. Oren Ltd. & Assocs.*, 672 P.2d 732, 735 (Utah 1983), but instead have deemed it subject to a threshold equitable inquiry into "the merits of the particular case . . . to avoid unreasonable penalties and forfeitures," *Lignell v. Berg*, 593 P.2d 800, 805 (Utah 1979) (internal quotation marks omitted).

¶ 40 In Legacy's view, invalidating the AA in the face of Liberty's inequitable conduct works an unreasonable penalty. Legacy identifies what it sees as "genuine issues of material fact" of relevance to "whether Liberty's claim of illegality renders the [AA] unenforceable": whether (1) Liberty knew when it drafted and executed the AA that Legacy was not a registered broker, (2) Liberty's general counsel attested that the arrangement was legal, and (3) Legacy was unaware of what constituted a "broker" under the securities laws.

¶ 41 Legacy's position is incompatible with the terms and conditions of our securities

---

**14.** Legacy's formulation of this rule is not precisely compatible with our precedent. *See Olsen v. Reese*, 114 Utah 411, 200 P.2d 733, 736 (1948) ("[F]ailure to obtain a license which is required by a statute enacted solely for revenue purposes does not render contracts made by the offending party void. . . . [C]ontracts made by an unlicensed contractor when in violation of a statute passed for the protection of the public are held to be void and unenforceable."); *see also Mosley v. Johnson*, 22 Utah 2d 348, 453 P.2d 149, 151 (1969) (stating that this rule operates only where a statute "impose[d] a penalty without expressly prohibiting the business or declaring void acts done or contracts made therein" (internal quotation marks omitted)).

statutes. First, section 61–1–22 prescribes a series of specified defenses—none of which encompass any of the equitable considerations put forward by Legacy. *See, e.g.,* UTAH CODE § 61–1–22(4)(a) (instituting a reasonable care defense for those with control person liability); *id.* § 61–1–22(3) (providing, as a defense to fraud in the sale of securities, that the purchaser "knew of the untruth or omission" or that the "seller did not know and in the exercise of reasonable care could not have known of the untrue statement or misleading omission"); *id.* § 61–1–22(7)(a) (imposing a statute of limitations that incorporates a discovery rule). The expression of these defenses can be read as an exclusion of others. *Marion Energy, Inc. v. KFJ Ranch P'ship,* 2011 UT 50, ¶ 14, 267 P.3d 863 (presuming that expression of one set of terms is "the exclusion of another" (internal quotation marks omitted)). Thus, we conclude that unexpressed equitable defenses were purposefully excluded. *See Go2net,* 143 P.3d at 593 (reaching the same conclusion about Washington's securities statute).

¶ 42 Second, the equitable considerations pressed by Legacy are incompatible with section 61–1–22(9). Under that provision, "[a] condition, stipulation, or provision binding a person acquiring a security to waive compliance with this chapter ... is void." This anti-waiver provision cannot coexist with Legacy's equitable notion that a party can lose the protection of the act by its knowledge of an existing violation. *See Go2net, Inc.,* 143 P.3d at 593 (reaching the same conclusion). If an express waiver is void, then a constructive waiver triggered by a party's knowledge is foreclosed a fortiori. We accordingly decline Legacy's invitation to read equitable defenses into section 61–1–22(8). As Legacy indicates, federal courts generally hold that the unenforceability clause of the federal securities act is subject to equitable defenses. *See, e.g., Reg'l Props., Inc. v. Fin. & Real Estate Consulting Co.,* 678 F.2d 552, 562 (5th Cir.1982). But "[a] substantial body" of mostly state caselaw exists "hold[ing] that the equitable defenses

have no place when construing statutory claims under the securities acts." 12A BLUE SKY LAW § 9:126 (citing cases from Washington, Illinois, Oregon, and Missouri). Those courts "reason that the public policy of maintaining compliance with [state] blue sky [or securities] laws outweighs any inequitable windfalls received by culpable plaintiffs, emphasizing "the penal purpose of the blue sky laws, which courts would defeat by allowing the nonstatutory defenses." Charles G. Stinner, *Estoppel and In Pari Delicto Defenses to Civil Blue Sky Law Actions,* 73 CORNELL L. REV. 448, 460–62 (1988). As one such court stated, "[w]ith such defenses, sellers could avoid liability under the registration provisions by informing would-be purchasers that the securities were unregistered. This would defeat the purpose of our blue sky laws." *Dunn v. Bemor Petroleum, Inc.,* 680 S.W.2d 304, 306 (Mo.Ct.App.1984).[15]

¶ 43 Granted, the "ordinary circumstance[ ]" for foreclosing the enforceability of a contract under Utah Code section 61–1–22(8) involves "a violator of the securities laws on the one hand and an 'innocent party' on the other." *Infra* ¶ 63. But we find no basis in our statute for limiting the terms of this section to that ordinary circumstance. The statutory bar on enforcement is unconditional and categorical. Without exception, this provision renders any "person" engaged in the performance of "any contract in violation of this chapter" unable to "base a suit on the contract." UTAH CODE § 61–1–22(8). And when the code proceeds to specify defenses, it fails to include any reference to estoppel, waiver, or in pari delicto. *See id.* § 61–1–22(3), (4), (7)(a). The closest our securities law comes to addressing these principles is in the waiver provision in section 61–1–22(9). And, as noted, that provision rejects the notion of an implied waiver by expressly foreclosing an express one.

¶ 44 Together, these provisions are an ample "indication" that section 61–1–22(8) was "intended to protect parties who themselves

15. Even jurisdictions that allow equitable defenses "[u]niformly ... have declined to allow equitable defenses to sellers in securities actions based on state blue sky laws where the investor did not actively participate in the management of the firm." Dave Gaba & Lawrence L. Klayman, *Equitable Defenses Under State Blue–Sky Acts,* 16 PIABA B.J. 281, 283–86 (2009).

were engaged in violations."[16] *Infra* ¶ 64. The operative legislative intent must be found in the terms of the statute. And here, we see nothing in the statute to limit the breadth of the categorical prohibition on a "suit on [a] contract" performed in violation of our securities law.

¶ 45 That conclusion is not altered by Utah Code section 61–1–22(10). That provision clarifies that the rights and remedies prescribed by statute "are *in addition to* any other rights or remedies that may exist at law or in equity." (Emphasis added). But that says only that our statute does not preempt *additional* common law rights and remedies. The equitable defenses identified by Legacy are not *additional* rights or remedies; they are defenses foreclosed by the express terms of the code.

¶ 46 Finally, even assuming, for the sake of argument, the applicability of the common law precedent invoked by Legacy, that precedent does not call for an abstract weighing of "the interest in the enforcement of" a contract against "the public policy behind" a particular legal rule, as Legacy puts it. Instead, our precedent calls for a more limited assessment. In our common law contract invalidation cases involving a failure to license, we typically have asked only if the complaining party "is within the class of persons whom the ... statute is designed to protect." *Oren Ltd.*, 672 P.2d at 735; *Lignell*, 593 P.2d at 805 (same). And that assessment would certainly run in Liberty's favor, as it, as a partner and issuer offering securities, is within the class of persons the securities statute was designed to protect. *See, e.g., Eastside Church of Christ v. Nat'l Plan, Inc.*, 391 F.2d 357, 362 (5th Cir.1968) (finding that an issuer of bonds sold under a contract was a member of the class of persons the act was designed to protect); *Reg'l Props.*, 678 F.2d at 561 ("[The federal statute] does not limit ... invalidity to contracts between issuers and sellers or to those between issuers and investors. The contracts involved here were between the general partners and a partnership that held itself out to be a qualified broker.").

¶ 47 Thus, Legacy has presented no persuasive ground for its continued enforcement of the AA. Because Legacy acted as an unlicensed broker when it performed its duties under the AA, that contract was performed in violation of state securities laws and Legacy is barred from enforcing it.

### 2. The NDA and Securities Law Violations

¶ 48 Legacy asserts that the same cannot be said of the NDA. It claims that nothing about the NDA or Legacy's performance of it violated securities laws. We agree.

¶ 49 Under the NDA, the parties agreed "not to circumvent, avoid, bypass, or obviate the other party directly or indirectly to avoid payment of fees in any transaction pending, or in the future." They also agreed to "keep totally confidential any and all information that is disclosed by the other party and not [to] disclose to any other person or entity any such information." Neither of those obligations, on their face, run afoul of the securities laws. And nothing in Legacy's performance implicated securities violations either, as neither maintaining confidentiality nor refraining from circumventing payment of fees is an activity that made Legacy look more like a broker. *See supra* ¶¶ 22–25 (listing factors that are indicative of broker status). The NDA and the obligations imposed therein certainly facilitated the parties' relationship, but they did not contribute to Legacy's broker status.

¶ 50 Liberty insists that Legacy "acted as a broker regardless of the contract under which it now seeks compensation," and that it "seeks compensation for those illegal services pursuant to an unenforceable contract, whether that compensation is pursuant to the AA, the NDA, or a combination of both agreements." But Legacy's acts as an unlicensed broker under one contract cannot render every other contract it enters into unenforceable. The question is whether *the NDA* was "made" or performed in violation

---

**16.** Legacy has not asserted a claim that Liberty is "in violation of Utah Code section 61–1–3(2)(a)." *Infra* ¶ 63. And if it had, then Liberty would be subject to appropriate sanctions or remedies associated with that violation—which sanctions, presumably, would have no capacity to resurrect a contract rendered unenforceable under section 61–1–22(8).

of the securities laws, UTAH CODE § 61–1–22(8), not whether that contract is related to others that were. And the NDA implicates no securities violations. It in no way calls for brokering activity, so it cannot be seen as a component of the unlawful brokerage relationship between Legacy and Liberty through Legacy's performance of the AA.

¶ 51 Liberty also challenges the NDA's legality on the ground that it is really just a part of the AA—a contract we find unenforceable. *See supra* ¶ 17. We are unpersuaded. The AA and the NDA are separate agreements supported by separate consideration. And because the NDA was neither made nor performed in violation of the securities laws, there is no statutory basis for deeming it unenforceable.

¶ 52 We thus reverse the district court's determination that the NDA is unenforceable under Utah Code section 61–1–22(8).

## C. Contract Interpretation

■ ¶ 53 That holding requires us to review the district court's alternative ground for granting Liberty's summary judgment motion on Legacy's NDA claim—specifically, the determination that the parties' contracts did not obligate Liberty to compensate Legacy for investors for non-CULA projects.[17] Even if this interpretation is correct, we find it an insufficient basis for summary judgment on the NDA claim.

¶ 54 Legacy's NDA claim was premised in part on the contention that Liberty used and/or disclosed Legacy's confidential investor information in violation of paragraph 3 of the NDA, which required the parties to "keep totally confidential any and all information that is disclosed by the other party." This claim does not relate to the compensation that may or may not have been owed to Legacy under the AA and the NDA. So whether the NDA has anything to say about the fees Legacy was owed is irrelevant to this claim for relief.

¶ 55 Liberty does not dispute that point. It suggests only that Legacy did not previously seek damages for disclosure of its confidential information, but sought compensation only for unpaid fees. But it is clear from Legacy's complaint that the basis of its claim under the NDA, as a stand-alone contract, was the disclosure of its confidential investor information. It is also clear that it sought damages related to that disclosure.

¶ 56 With this in mind, Liberty concedes that "if this Court finds the NDA enforceable, and if [Legacy's] damages are limited to disclosure … then … a material fact issue regarding disclosure, but not circumvention, could exist." We agree, and reverse the district court's grant of summary judgment on Legacy's claim for breach of the NDA by improper use or disclosure of Legacy's confidential information.

## III. Trade Secret Claim

¶ 57 With that breach of contract claim still in play, the district court's ground for dismissing Legacy's trade secret claim vanishes. The district court determined that because the AA and the NDA are unenforceable, there was no basis for protecting Legacy's contacts as a trade secret under the Uniform Trade Secrets Act. *See* UTAH CODE § 13–24–2(4) (defining "trade secret"). That premise no longer holds. Because we agree with the district court's assessment that "whether the contacts supplied by Legacy to Liberty constitute a trade secret raises issues of material fact," summary judgment is not appropriate on Legacy's trade secret claim. We accordingly reverse on this point, reinstating the trade secret claim.

## IV. Rule 56(f) Request

■ ¶ 58 Finally, we address Legacy's claim that the district court erred in failing to consider and rule on its request for a continuance and additional discovery. We hold that any such error in this regard was harmless. *H.U.F. v. W.P.W.*, 2009 UT 10, ¶ 44, 203 P.3d 943 ("[H]armless error is an error that is sufficiently inconsequential that there is no reasonable likelihood that it affected the outcome of the proceedings." (al-

17. It is not clear to us that the district court considered this to be an independent ground for granting Liberty's summary judgment motion.

Because it is unclear and because both parties have interpreted it as such, we will do the same.

teration in original) (internal quotation marks omitted)).

¶ 59 Legacy asked the district court to grant further discovery on three issues: (1) whether Legacy acted as a broker, (2) Liberty's illegality defense and equitable considerations that would preclude Liberty from avoiding the AA, and (3) whether Liberty had fully paid Legacy for amounts owed on the CULA project. Yet none of the requested discovery could plausibly have made any difference. First, the undisputed facts establish Legacy's status as a broker, *see supra* ¶¶ 30–33, and Legacy has failed to explain how any further discovery could have yielded a different conclusion. Second, we have now held that Utah Code section 61–1–22(8) is not subject to equitable defenses, so discovery on that matter was likewise uncalled for. *See supra* ¶¶ 44–45. Finally, because we determine that the AA is unenforceable due to Legacy's securities violations, Legacy cannot seek compensation under that contract, *see supra* ¶ 48, and discovery on the extent of payments made or due would be futile.

¶ 60 Thus, Legacy cannot show that the discovery it sought would have helped its case against Liberty. It has therefore "identified no harm that could be remedied by a remand" on this issue, *Maxfield v. Herbert*, 2012 UT 44, ¶ 23, 284 P.3d 647, and we accordingly decline to do so.

### V.  Conclusion

¶ 61 Because Legacy acted as a broker when it performed its obligations under the AA, it cannot now seek to enforce that contract. The same infirmity does not doom Legacy's claim under the NDA, however. Nor does the district court's interpretation of the scope of the NDA with regard to payment of fees by Liberty to Legacy. We accordingly affirm the district court's grant of summary judgment with respect to breach of the AA and reverse its grant of summary judgment on the NDA claim. Further, because failure of the NDA breach of contract claim can no longer serve as a basis for dismissal of Legacy's trade secret claim, and because genuine issues of fact remain on that claim, we reverse and reinstate that claim. And lastly, we conclude that any error in the failure to consider Legacy's rule 56(f) request was harmless.

Justice LEE authored the opinion of the Court, in which Chief Justice DURRANT and Justice PARRISH joined, and in which Associate Chief Justice NEHRING and Justice DURHAM joined except as to Part II.B.1.

Justice DURHAM filed a concurring opinion, in which Associate Chief Justice NEHRING joined.

Justice DURHAM, concurring:

¶ 62 I concur in the majority opinion except for the analysis in section II.B.1, but I nevertheless concur in the result.

¶ 63 This case poses an unusual factual conundrum. The ordinary circumstances under which Utah Code section 61–1–22(8)'s prohibition applies involve a violator of the securities laws on the one hand and an "innocent party" on the other; this case comes to us (allegedly) with two violators. Legacy has claimed that Liberty, in requesting, negotiating, and contracting for the activities of Legacy, knew that Legacy was not licensed as a broker-dealer. If these allegations are true, Liberty would be in violation of Utah Code section 61–1–3(2)(a), making it unlawful for any issuer "to employ or engage an agent unless the agent is licensed."

¶ 64 Under such circumstances, I am unpersuaded by the majority's assertion that Liberty's mere status as an issuer automatically qualifies it for membership in the class of persons the securities statute was designed to protect. I think this is a fact-dependent inquiry, not merely a structural one. I see no indication in the statute as a whole or any of its provisions that it was designed or intended to protect parties who themselves were engaged in violations and/or were responsible for securing or facilitating the violations they subsequently pose as a bar to liability.

¶ 65 The majority rejects the possibility that common law equitable considerations might have any relevance to our construction of the statute. I find this position incompatible with the statutory language itself, which

in Utah Code section 61–1–22(10) provides that "[t]he rights and remedies provided by this chapter are in addition to any other rights or remedies that may exist at law or in equity." We are thus construing a statute that explicitly references equity and the common law. This is even more reason to follow "virtually all other [federal] courts" that have held that equitable considerations should be taken into account before determining a contract is unenforceable under a similar unenforceability provision in the federal securities act. *Reg'l Props., Inc. v. Fin. & Real Estate Consulting Co.*, 678 F.2d 552, 562 (5th Cir. 1982); *see also Mills v. Elec. Auto–Lite Co.*, 396 U.S. 375, 388, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970) (stating in dicta that the federal unenforceability clause may be used to set aside a corporate merger "only if a court of equity concludes, from all the circumstances, that it would be equitable to do so"). Were it not for my conclusions (set forth below) concerning the scope of the agreement at issue here, I would reverse summary judgment on the contract claim and remand for the development of facts that would (or would not) support equitable defenses to Liberty's claim that the agency agreement is unenforceable, such as waiver, estoppel, or *in pari delicto*.

¶ 66 Notwithstanding my disagreement with the majority's interpretation of the statute, I concur in the result of its opinion on the contract claim. The opinion does not reach the question of whether the agency agreement covered all future oil and gas projects (as Legacy contends) or whether it was limited to the first two CULA projects (as Liberty contends). Having examined the agreement, I conclude that it clearly references the CULA projects and is limited to them. Therefore, even assuming that there may be facts supporting Legacy's equitable claims, no recovery would be available under its terms.