INDUS PARTNERS, LLC *vs.* INTELLIGROUP, INC.

No. 09-P-941.

Suffolk. March 4, 2010. - September 23, 2010.

Present: LENK, GRASSO, & VUONO, JJ.

*Practice, Civil,* Summary judgment. *Contract,* Construction of contract. *Uniform Securities Act. Securities,* Registration of broker-dealer, Sale. *Words,* "Broker-dealer."

In a civil action brought by a plaintiff alleging, inter alia, breach of contract, the judge correctly granted summary judgment in favor of the defendant, where the agreement at issue, which plainly called for the plaintiff to act as a broker-dealer within the meaning of the Uniform Securities Act (act), G. L. c. 110A, was unenforceable, given that the plaintiff had failed to register as a broker-dealer under the act. [794-802]

CIVIL ACTION commenced in the Superior Court Department on May 18, 2006.

The case was heard by *Raymond J. Brassard,* J., on motions for summary judgment.

*George P. Lordan, Jr.,* for the plaintiff.
*Brooks A. Ames* for the defendant.

LENK, J. The plaintiff, Indus Partners, LLC (Indus), appeals from the entry of summary judgment dismissing its breach of contract, quantum meruit, promissory estoppel, and G. L. c. 93A claims against the defendant, Intelligroup, Inc. (Intelligroup). Indus and Intelligroup entered into a contractual agreement in 2003 (Agreement) generally calling for Indus to "advise and consult" with Intelligroup about any potential sale of Intelligroup to any potential buyer.[1] At all relevant times, Indus was

---

[1] The Agreement provided in relevant part that Indus was to consult with and advise Intelligroup regarding "a possible Transaction . . . involving [Intelligroup] and any other party." "Transaction" was defined to include, among other things, the "sale or other transfer, directly or indirectly, of all or any

not registered under the Massachusetts Uniform Securities Act, G. L. c. 110A (Act), as a "broker-dealer."[2] After Intelligroup sold one of its divisions to a buyer in April, 2003, and refused Indus's demands for certain payments Indus claimed to be due under the Agreement, this litigation ensued. Concluding that the Agreement on its face called for Indus to act as a broker-dealer within the meaning of the Act, the motion judge dismissed Indus's claims because, pursuant to G. L. c. 110A, §§ 201(*a*) and 410(*f*),[3] its failure to register precluded it from "[b]asing any suit on the contract." On appeal, Indus claims that its conduct and the parties' understanding compel the opposite conclusion. We affirm.

*Analysis.* On appeal, Indus contends that its claims were dismissed in error because (a) Indus was not in fact a broker or dealer under the Agreement, and (b) any ambiguity in the terms of the Agreement was not resolved consistent with the parties' expressed intent.[4] In our review, we examine "whether, viewing the evidence in the light most favorable to the nonmoving party, all material facts have been established and the moving party is entitled to a judgment as a matter of law." *Augat, Inc.* v. *Liberty Mut. Ins. Co.*, 410 Mass. 117, 120 (1991), citing Mass.R.Civ.P. 56(c), 365 Mass. 824 (1974). Intelligroup, as the moving party, bears the burden of affirmatively demonstrating the absence of a triable issue and its entitlement to judgment as a matter of law. *Pederson* v. *Time, Inc.*, 404 Mass. 14, 17 (1989).

A. *The Agreement.* Under the Act, it is "unlawful for any person to transact business in this commonwealth as a broker-dealer

---

portion of the assets or securities, (whether outstanding or newly issued) of [Intelligroup]." In return, Indus was to receive a $10,000 monthly retainer. Upon consummation of a transaction, Indus would also receive a cash transaction fee of $500,000 plus 1.5% of any consideration received in excess of $30 million.

[2]"It is unlawful for any person to transact business in this commonwealth as a broker-dealer or agent unless he is registered under this chapter." G. L. c. 110A, § 201(*a*), as amended by St. 2002, c. 74, § 2.

[3]"No person who has made or engaged in the performance of any contract in violation of any provision of this chapter . . . may base any suit on the contract." G. L. c. 110A, § 410(*f*), inserted by St. 1972, c. 694, § 1.

[4]Indus also claims that the judge erred in his reliance on *Novelos Therapeutics, Inc.* v. *Kenmare Capital Partners, Ltd.*, 13 Mass. L. Rep. 389 (Mass. Super. Ct. 2001). Because principles of statutory and contractual interpretation independently compel the decision reached, we do not address this claim.

or agent unless he is registered under this chapter." G. L. c. 110A, § 201(*a*). Failure to register accordingly constitutes a violation of the Act. *Ibid.* Further, "[n]o person *who has made* or engaged in the performance of any contract in violation of any provision of [the Act] . . . may base any suit on the contract" (emphasis supplied). G. L. c. 110A, § 410(*f*). The act of making the contract itself, irrespective of performance, can thus suffice to preclude suit brought on that instrument. *Ibid.* Hence, we look to the Agreement on which Indus bases its suit.

"The interpretation of a contract presents a question of law for the court." *USM Corp.* v. *Arthur D. Little Sys., Inc.,* 28 Mass. App. Ct. 108, 116 (1989), citing *Robert Indus., Inc.* v. *Spence,* 362 Mass. 751, 755 (1973). We "must first examine the language of the contract by itself, independent of extrinsic evidence concerning the drafting history or the intention of the parties." *Bank* v. *Thermo Elemental, Inc.,* 451 Mass. 638, 648 (2008), citing *General Convention of the New Jerusalem in the U.S. of America, Inc.* v. *MacKenzie,* 449 Mass. 832, 835-836, 838 (2007). Extrinsic evidence may be considered "in the construction of ambiguous contract language." *USM Corp.* v. *Arthur D. Little Sys., Inc., supra* at 116. However, "ambiguity is not created simply because a controversy exists between parties, each favoring an interpretation contrary to the other's." *Suffolk Constr. Co., Inc.* v. *Lanco Scaffolding Co.,* 47 Mass. App. Ct. 726, 729 (1999), quoting from *Jefferson Ins. Co.* v. *Holyoke,* 23 Mass. App. Ct. 472, 475 (1987). Rather, the question is whether "the phraseology can support [a] reasonable difference of opinion as to the meaning of the words employed and the obligations undertaken." *Ibid.,* quoting from *Fashion House, Inc.* v. *K Mart Corp.,* 892 F.2d 1076, 1083 (1st Cir. 1989).

The Agreement described in detail the various services that Indus was expected to perform, from "[a]ssist[ing] [Intelligroup] . . . in preparation of the appropriate documentation," to participating "in all phases of the Transaction, including financial analysis, if requested." Indus was to "arrange and participate in the conduct of inspection visits" with potential buyers, and to "make such introductions and perform such services as may be necessary" to consummate the deal. Indus was also called upon to "[a]dvise and assist in the analysis and

evaluation of potential buyers," and "to develop a general negotiation strategy for accomplishing the Transaction." Indus does not contend that any provision of the Agreement is ambiguous, and we discern no such ambiguity. The duties imposed on Indus are both broad and, at the same time, quite specific. Because the unambiguous contract language does not "support [a] reasonable difference of opinion as to the meaning of the words employed and the obligations undertaken," we do not look beyond the four corners of the contract. *Suffolk Constr. Co. v. Lanco Scaffolding Co., supra,* quoting from *Fashion House, Inc. v. K Mart Corp., supra.* Thus, if the duties described in the Agreement constitute broker-dealer services, the Agreement is unenforceable. G. L. c. 110A, § 410(f).

B. *Broker-dealer services.* With certain exceptions, the Act defines a "broker-dealer" as "any person engaged in the business of effecting transactions in securities for the account of others . . . ." G. L. c. 110A, § 401(*c*), as amended by St. 2002, c. 74, § 9.[5] Neither the term nor its definition has been construed in an appellate decision in this Commonwealth. The Act itself, however, instructs that it is to be construed in a manner so as "to coordinate the interpretation and administration of this chapter with the related federal regulation." G. L. c. 110A, § 415, inserted by St. 1972, c. 694, § 1. The Act's definition of broker-dealer "essentially repeats the definition [of 'broker'] set forth in the Securities Act of 1933 and the Securities Exchange Act of 1934." *Silvia* v. *Securities Div.,* 61 Mass. App. Ct. 350, 356 (2004), citing *Valley Stream Teachers Fed. Credit Union* v.

---

[5] "Brokers are those who act on behalf of others, while dealers execute transactions for their own benefit." Roinila & Fishman, Law and Explanation: Uniform Securities Act of 2002 par. 104, at 20 (2003). The "compound term is meant to include either a broker or a dealer. The recognized distinction is that a broker acts for the benefit of another while a dealer acts for itself in buying for or selling securities from its own inventory." Seligman, New Uniform Securities Act 13 (2003). Registration of broker-dealers "helps to ensure that persons who have a 'salesman's stake' in a securities transaction operate in a manner that is consistent with consumer protection standards." Herbruck, Alder & Co., SEC No-Action Letter, http://www.eueur.com/divisions/marketing/mr-noaction/herbruckadler050302.htm (last visited Sept. 20, 2010); 2002 SEC No. Act. Lexis 499, *4 (May 3, 2002). "That principle not only encompasses the individual who directly takes a customer's order for a securities transaction, but also any other person who acts as a broker with respect to that order." *Ibid.*

*Commissioner of Banks,* 376 Mass. 845, 857-858 (1978). Moreover, "Federal decisions provide a meaningful, though not conclusive, guide" in interpreting Massachusetts securities law. *Ibid.* See *Wynn & Wynn, P.C.* v. *Massachusetts Commn. Against Discrimination,* 431 Mass. 655, 669 n.29 (2000) (same). We accordingly turn to the Federal statutes and decisions for guidance in determining whether Indus was a broker-dealer under the Act, "engaged in the business of effecting transactions in securities."[6] We examine each component of the definition separately.

1. *"Engaged in the business."* The Securities Exchange Act of 1934 (1934 Act) defines a "broker" in precisely the same way that the Act defines "broker-dealer." Under each, the definition is: "any person engaged in the business of effecting transactions in securities."[7] G. L. c. 110A, § 401(*c*). 15 U.S.C. § 78c(a)(4)(A) (2006). In the Federal context, "[a] person effects transactions in securities if he or she participates in such transactions 'at key points in the chain of distribution.' " BondGlobe, Inc., SEC No-Action Letter [2000-2001 Transfer Binder] Fed. Sec. L. Rep. (CCH) par. 78,056, at 77,518; 2001 SEC No-Act. Lexis 140, at *2 (Feb. 6, 2001), quoting from *Massachusetts Financial Servs., Inc.* v. *Securities Investor Protection Corp.,* 411 F. Supp. 411, 415 (D. Mass. 1976), aff'd, 545 F.2d 754 (1st Cir. 1976), cert. denied, 431 U.S. 904 (1977).

The Agreement called on Indus to participate "in all phases of the Transaction, including financial analysis, if requested, and as appropriate." "Regardless of the nature of [Indus's] relationship to [Intelligroup,] it is beyond question" that it was obliged to "regularly participate[] at key points in the chain of

---

[6]See *Black Diamond Fund, LLLP* v. *Joseph,* 211 P.3d 727 (Colo. Ct. App. 2009), a case similarly guided by Federal statutes and decisions when construing that State's Securities Act.

[7]Because the Act uses the compound term "broker-dealer," the full definition is "any person engaged in the business of effecting transactions in securities for the account of others or for his own account." G. L. c. 110A, § 401(*c*). The Federal statute defines the term "broker" as one performing such functions "for the accounts of others," while one who transacts for his or her "own account" is defined as a "dealer." 15 U.S.C. § 78c(a)(4)(A); 78c(a)(5)(A) (2006). Given that the Act's compound term is more inclusive, and the crucial phrase "effecting transactions in securities" is precisely the same in both statutes, the difference in treatment as to "broker" and "dealer" is immaterial to the analysis.

distribution." *Securities & Exch. Commn.* v. *Howard J. Hansen,* No. 83 Civ. 3692, 1984 U.S. Dist. Lexis 17835, at *25 (S.D. N.Y. Apr. 6, 1984). Moreover, the specific duties imposed on Indus by the Agreement "fall well within the more detailed definition of a broker used in the scholarly literature interpreting the Exchange Act." *Id.* at *26.

2. *"Effecting transactions in securities."* Under Federal law, the factors "relevant to a determination of whether an individual acted as a broker within the meaning of the statute" include:

> "whether that person 1) is an employee of the issuer; 2) received commissions as opposed to a salary; 3) is selling, or previously sold, the securities of other issuers; 4) is involved in negotiations between the issuer and the investor; 5) makes valuations as to the merits of the investment or gives advice; and 6) is an active rather than passive finder of investors."

*Ibid.* See *Securities & Exchange Comm.* v. *Zubkis,* No. 97 Civ. 8086, 2000 U.S. Dist. Lexis 1865 (S.D.N.Y. Feb. 23, 2000) (same).

Under the Agreement, Indus was engaged to serve "as a management consultant and advisor to [Intelligroup's] Chief Executive Officer." The Agreement provided that Indus would receive, not a salary, but what amounts instead to a commission: "a cash transaction fee . . . which is payable at the closing of a Transaction, in an amount equal to $500,000, plus 1.5% of the Aggregate Consideration in excess of $30,000,000." This was directly linked to the potential sale of securities, and the Agreement stipulated that "[n]o Transaction Fee shall be payable in a Transaction where the price paid per share for [Intelligroup's] common stock is less than $2.00." See G. L. c. 110A, § 401(*k*), inserted by St. 1972, c. 694, § 1 (" 'Security' means any note; stock"). See also *Landreth Timber Co.* v. *Landreth,* 471 U.S. 681, 694 (1985) (definition of "stock" as a type of security is "standardized enough to rest on [its] name[]," and requires no further analysis).

In issuing "No-Action" letters to market participants, the Securities and Exchange Commission (SEC) has found transaction-based fee arrangements to be "key factors" in

determining whether broker-dealer registration is required. Herbruck, Alder & Co., No Action Letter, http://www.eueur.com/divisions/marketing/mr-noaction/herbruckadler050302.htm (last visited Sept. 20, 2010); 2002 SEC No-Act. Lexis 499, at *4 (May 3, 2002). Indeed, such an arrangement is "one of the hallmarks of being a broker-dealer." John R. Wirthlin, SEC No-Action Letter, 1999 SEC No-Act. Lexis 83, *2 (January 19, 1999). See Dominion Resources, Inc., SEC No-Action Letter, 2000 SEC No-Act. Lexis 304, at *2 (March 7, 2000) (registration required where, among other things, company was to receive "a negotiated fee that would generally not be payable unless the financing closed successfully"); Davenport Management, Inc., SEC No-Action Letter [1993 Transfer Binder] Fed. Sec. L. Rep. (CCH) par. 76,643, at 77,730; 1993 SEC No-Act. Lexis 624, at *12 (April 13, 1993) (registration required where, among other things, business broker receives transaction fees); C&W Portfolio Management, Inc., SEC No-Action Letter, SEC No-Act. Lexis 1286, at *2 (July 20, 1989) (registration required where company receives a set fee contingent upon consummation of the transaction). The fact that the Agreement's "proposed activities would result in [Indus] receiving transaction-based compensation" weighs in favor of concluding that broker-dealer registration was required. BD Advantage, Inc., SEC No-Action Letter [2000-2001 Transfer Binder] Fed. Sec. L. Rep. (CCH) par. 78,029, at 77,376; 2000 SEC No-Act. Lexis 593, at *4 (Oct. 11, 2000).

Moreover, the Agreement called for Indus to be extensively involved in negotiating a potential sale of securities. Indus was to "[a]ssist [Intelligroup] . . . in all phases of the transaction," including "arrang[ing] and participat[ing] in the conduct of inspection visits and meetings and otherwise mak[ing] such introductions and perform[ing] such services as may be necessary to determine the interest and capabilities of the identified parties."[8] Such conduct is in the nature of broker-dealer activity. John R. Wirthlin, *supra* at *1 ("arranging and attending the first meeting" between two parties to transaction is broker-dealer

---

[8]The plain language of the Agreement is substantially at odds with the contention Indus makes on appeal, to the effect that it was not required to negotiate, identify, or communicate with third parties.

activity). See MuniAuction, Inc., SEC No-Action Letter [2000 Transfer Binder] Fed. Sec. L. Rep. (CCH) par. 77,830, at 76,776; 2000 SEC No-Act. Lexis 359, at *2 (March 13, 2000) (broker-dealer registration required where entity "brings buyers and sellers of securities together for a fee"). The Agreement also called for Indus to assist with "preparation of the appropriate documentation" for potential purchasers, to "[a]dvise and assist in the analysis and evaluation of potential buyers," or offers, and "to develop a general negotiation strategy for accomplishing the Transaction." Further, pursuant to the Agreement, Indus would "[p]articipate in the closing of the Transaction," and, if the transaction were successful, would be permitted to "place a 'tombstone' or other such announcement" in various trade periodicals trumpeting its involvement in the deal in hopes of attracting new business. These provisions reflect Indus's obligation both to "make[] valuations as to the merits of the investment or give[] advice," and to become "involved in the negotiations" between parties to a potential securities transaction. *Securities & Exch. Commn.* v. *Howard J. Hansen, supra* at *26. The fact that Indus would "participate in negotiations" which could lead to a sale of securities is further indication that the Agreement called for broker-dealer activities.[9] Dominion Resources, Inc., *supra* at *2. See Davenport Management, Inc., *supra* at *7 (being "actively involved in securities transac-

---

[9]Under the Colorado Securities Act, "the definition of 'sales representative'. . . resembles the definition of 'broker' in the 1934 Securities Exchange Act, 15 U.S.C. § 78c(a)(4)(A)." *Black Diamond Fund, LLLP* v. *Joseph*, 211 P.3d 727, 733 (Colo. Ct. App. 2009). "Both definitions use the term 'effecting' with respect to the sale of or transaction in a security on behalf of another." *Id.* at 734. In interpreting that term, the Colorado Court of Appeals noted that "[t]he SEC has identified transaction-based compensation as indicative of whether one is a broker because such compensation is triggered by the 'effecting' of a sale." *Ibid.*, citing Herbruck, Adler & Co., *supra*; 1st Global, Inc., SEC No-Action Letter [2001 Transfer Binder] Fed. Sec. L. Rep. (CCH) par. 78,119, at 77,799, 2001 SEC No-Act. Lexis 557 (May 7, 2001); Wirthlin, *supra*. The court also determined that "[e]ffecting transactions in securities is shown by . . . participating in securities transactions 'at key points in the chain of distribution.' " *Ibid.*, quoting from *Securities & Exch. Commn.* v. *National Executive Planners, Ltd.*, 503 F. Supp. 1066, 1073 (M.D.N.C. 1980). Because, as here, the defendant in *Black Diamond* received transaction-based compensation and "facilitated all aspects of the investment other than the formal acceptance of the subscription agreements," his failure to register constituted a violation of the Colorado Securities Act. *Ibid.*

tions," such as "by negotiating their terms, providing advice regarding their terms, or providing other assistance," requires registration); C&W Portfolio Management, Inc., *supra* at *2 (registration required where entity "acts as an intermediary until both principals to the transaction are in agreement"). Compare Angel Capital Electronic Network, SEC No-Action Letter, 1996 SEC No-Act. Lexis 812, at *2 (October 25, 1996) (broker-dealer registration not required where company would not "(1) provide advice about the merits of particular opportunities or ventures; (2) receive compensation . . . other than nominal, flat fees . . . and . . . such fees [would] not be made contingent upon the outcome or completion of any securities transaction . . . ; (3) participate in any negotiations . . .").

That Indus neither held Intelligroup's assets nor had the authority to bind it contractually is not dispositive of the result here. The Agreement's transaction-based compensation arrangement, coupled with its requirement that Indus be extensively involved in negotiations, would confer broker-dealer status even though the ultimate "exchange of funds or securities [would be] arranged by the principals, and not [Indus]." C&W Portfolio Management Inc., *supra* at *2. Nor is this a situation where Indus was to "take an essentially passive role toward the interaction between [Intelligroup] and [a potential buyer], other than routing messages." BondGlobe, *supra* at *4 n.3, citing Charles Schwab & Co., SEC No-Action Letter, 1996 SEC No-Act. Lexis 976 (November 27, 1996). In the Schwab letter, the SEC concluded that registration was not required where Internet service providers agreed "to connect their subscribers" to a securities brokerage firm "for a nominal, flat, per order fee." Charles Schwab & Co., Inc., *supra* at *1. As discussed, the Agreement plainly called for Indus to do far more than serve as a passive conduit between brokers and investors. The SEC "has never extended the Schwab letter beyond that narrow context," and we decline to do so under the Massachusetts Act. Bondglobe, *supra* at *4 n.3.

Given the foregoing, we conclude that the Agreement called for activities that have long required broker-dealer registration under Federal law, from which we take guidance in construing the Act. The motion judge properly concluded that Indus's

failure to register as a broker-dealer rendered the Agreement unenforceable. G. L. c. 110A, § 201(*a*). Summary judgment was properly granted.

*Judgment affirmed.*