Capital Artists, LLC, (“Capital”) is a minority shareholder in Active Protective Technologies, Inc. (“APT”). Several years ago, Asahi Kasei Holdings US, Inc. (“AK Holdings”) agreed to provide APT with funding in exchange for certain rights, including an option to acquire APT by way of merger and the right to appoint two of APT’s board members (the “AK Directors”). To date AK Holdings has loaned APT a total of $19.5 million. Capital brought this lawsuit derivatively on behalf of APT in an attempt to invalidate the contracts that APT entered into with AK Holdings.
Capital claims that: (I) AK Holdings materially breached the parties’ Note Participation Agreement as well as their Option and Support Agreement (the “Option Agreement”) by failing to pay the entire initial consideration required under those contracts, and that those contracts as well as the negotiated but as yet unexecuted Agreement and Plan of Merger (the “Merger Agreement”) are therefore unenforceable; (ii) the Note Participation Agreement is unenforceable for the additional reason that it requires usurious interest payments; and (iii) AK Holdings aided and abetting  breaches  of  fiduciary  duty  by  the  AK Directors.
The Court will allow the motion by AK Holdings to dismiss all claims under Mass. R. Civ. P. 12(b)(6). The facts alleged in and the exhibits attached to the amended complaint establish that most of Capital’s claims are barred by its binding covenant not to challenge the validity of or seeking to prevent the operation of the Note Purchase Agreement, the Option Agreement, or the Merger Agreement. In any case, even if this covenant not to sue did not bar most of the claims asserted in this case, the facts alleged in the amended complaint do not plausibly suggest that Capital will be entitled a judgment
 
                                                            -1-
 
invalidating the challenged agreements or that the AK Directors committed any breach of fiduciary duty that AK Holdings could have aided or abetted.
1. Legal and Factual Background. The following legal standards, as well as the following alleged in the amended complaint or established by the exhibits to that pleading, inform the Court’s evaluation of the motion to dismiss.
1.1. Legal Standards—Rule 12(b)(6). To survive a motion to dismiss under Rule 12(b)(6), a complaint must make factual allegations that, if true, would “plausibly suggest …  an  entitlement  to  relief.”  Lopez  v.  Commonwealth,  463 Mass. 696, 701 (2012), quoting Iannacchino v. Ford Motor Co., 451 Mass. 623, 636 (2008), and Bell Atl. Corp. v. Twombly, 550 U.S. 544, 557 (2007).
“Conclusory allegations” are not enough; judges must disregard such assertions and “focus on whether the factual allegations plausibly suggest an entitlement to relief.” Maling v. Finnegan, Henderson, Farabow, Garrett & Dunner, LLP, 473 Mass. 336, 339 (2015), quoting Curtis v. Herb Chambers I-95, Inc., 458 Mass. 674, 676 (2011).
In deciding the pending motion to dismiss, the Court may consider the factual allegations in the amended complaint as well as the contents of the exhibits that Capital attached to its complaint. See, e.g., Melia v. Zenhire, Inc., 462 Mass. 164, 166 (2012).
“The purpose of rule 12(b)(6) is to permit prompt resolution of a case where the allegations in the complaint clearly demonstrate that the plaintiff’s claim is legally insufficient.” Harvard Crimson, Inc. v. President and Fellows of Harvard Coll., 445 Mass. 745, 748 (2006). Where a complaint sets out “detailed factual allegations which the plaintiff contends entitle him to relief,” a claim may be dismissed if those allegations “clearly demonstrate that plaintiff does not have a claim.” Fabrizio v. City of Quincy, 9 Mass. App. Ct. 733, 734 (1980) (affirming dismissal); accord Nguyen v. Univ. of Mass., 66 Mass. App. Ct. 276, 277 (2006) (affirming dismissal).
For this reason, “[i]f it is evident from the allegations of the complaint alone that the defendant is entitled to an affirmative defense, the matter may be decided by means of a motion to dismiss” (cleaned up). Fleming v. Nat'l Union Fire Ins. Co., 445 Mass. 381, 389–390 (2005), quoting Gutierrez v. Mass. Bay Transp. Auth., 437 Mass. 396, 404 (2002).
 
                                                            -2-
 
1.2. Factual Background. The amended complaint alleges, or the exhibits attached to the amended complaint establish, the following.[1]
APT is a privately-held Delaware corporation. Capital owns about 27.5 percent of its outstanding shares. According to the amended complaint, APT “is a healthcare products company focused on developing advanced personal safety solutions.” Capital alleges that APT’s “flagship product” is a device called the “Tango Belt, which is clinically proven to reduce the risk of fall-induced hip fractures” by detecting falls and deploying “a protective airbag to absorb and reduce impact forces.”
1.2.1. The Challenged Contracts. In 2021, APT was in “dire financial straits.” It needed “additional capital, without which the Company would have been forced to close.” To secure needed funding, APT entered into two inter-related contracts with AK Holdings, which were effective as of September 1, 2021.
Under the Note Purchase Agreement, AK Holdings and an individual investor agreed to invest up to $17.2 million in APT; AK Holdings agreed to provide $17 million of the total financing, and the individual investor agreed to provide the remaining $200,000.
AK Holdings and the individual investor agreed to provide initial financing totaling $6.7 million by purchasing a First Tranche of convertible notes (with AK Holdings to provide $6,622,093, and the individual investor to provide the balance of $77,907). They also agreed to purchase a Second Tranche of convertible notes if certain milestones were met (with AK Holdings to provide up to an additional $10,377,907, and the individual investor up to an additional $122,093).
In exchange for making these funding commitments, AK Holdings was granted the right to appoint two directors to APT’s board as well as an option to acquire APT through a future merger.
At the same time that APT and AK Holdings entered into the Note Purchase Agreement, they also executed the Option Agreement that gave AK Holdings
 
--------------------------------------------
 
[1] The Court previously denied a joint motion to impound much of Capital’s amended complaint and the entire text of the agreements that are exhibits to the complaint. It did so because the parties did not meet their burden of proving that there was any good cause to impound that material.
 
                                                            -3-
 
an exclusive option to acquire APT on agreed-upon terms and subject to certain conditions.
Section 2.3 of the Option Agreement provides that AK Holdings would pay $1 million as consideration for being granted the option to acquire APT. However, § 1(e) of the Note Purchase Agreement provides that $1 million of the initial $6.622 million in financing to be provided by AK Holdings would count and be treated as the $1 million option premium, in addition to being part of the principal amount borrowed by APT.[2]
The terms of any future merger are set forth in a pre-negotiated but as yet unexecuted Merger Agreement, which is an exhibit to the Option Agreement. The Merger Agreement provides that, if AK Holdings were to exercise its option to acquire all shares of APT in a merger transaction, then AK Holdings would pay a Purchase Consideration equal to $61 million, minus the Closing Date Company Indebtedness and all Transaction Costs, plus the Net Working Capital Adjustment and the Aggregate Exercise Price for vested share options. These terms are defined in a manner that specifies how they are to be determined and calculated at the time of any merger closing.
APT’s “Closing Date Company Indebtedness” will be determined in large part by the Note Purchase Agreement. Section 2.3 of the Note Purchase Agreement provides that, in the event of a merger with AK Holdings, any outstanding First Tranche or Second Tranche notes would be repaid in an amount equal to    200 percent of the principal plus 100 percent of accrued but unpaid interest.
As discussed below, the interaction of this provision with the payment terms of the Merger Agreement has the effect of reducing the price that AK Holdings would have to pay to acquire APT in a merger.
1.2.2. Approval and Disclosures. Capital and the other shareholders of APT approved the 2021 financing deal between APT and AK Holdings. They did so in two ways. First, Capital and the other APT shareholders executed Written Consents in which they approved the Note Purchase Agreement, the agreed- upon change in the composition of APT’s board of directors, the Option Agreement, the Merger Agreement, and the contemplated future Merger.
 
--------------------------------------------
 
[2] Section 1(e) of the Note Purchase Agreement provides, in relevant part, that “the amount of Consideration payable by the Lead Purchaser at the closing for the First Tranche shall be reduced by $1,000,000 to reflect the Company Option Premium (as defined in the Option Agreement).”
 
                                                            -4-
 
Second, Capital and the other APT shareholders were parties to and executed the Option Agreement.
In addition, the owner of Capital was a member of APT’s board in 2021 and, in that capacity, signed the board’s Written Consent approving the 2021 financing deal.
The Written Consents signed by Capital and its owner (and by the other shareholders and directors) disclosed, among other things, that the $1 million premium to be paid by AK Holdings in exchange for receiving the option to acquire APT “will be deducted from the consideration paid by” AK Holdings “in connection with the Closing of the First Tranche” under the Note Purchase Agreement.
These Written Consents also disclosed that the $61 million Purchase Consideration to be paid by AK Holdings under the Merger Agreement would be reduced by an amount equal to 200 percent of the Principal Amount (specified to be up to $17.2 million) owed under the Note Purchase Agreement plus 100 percent of the unpaid interest due on those notes. The Written Consents made this disclosure by stating that the Purchase Consideration is subject to various adjustments, “including a reduction equal to … 2x the Principal Amount … plus all accrued but unpaid interest thereon.” The Written Consents added that interest would accrue “at an annual compounded rate of ten percent (10%).”
1.2.3. Amounts Provided to APT. To date, AK Holdings has provided APT with the entire $17 million in funding that it agreed to provide in the Note Purchase Agreement, plus an additional $2.5 million, for a total of $19.5 million.
As promised, the First Tranche closed on September 1, 2021, with AK Holdings paying $6.622 million and the individual investor paying $0.078 million to APT.
When APT did not meet the milestones that were a condition of the Second Tranche, AK Holdings agreed in July 2023 to extend the deadline and provided an additional $2.265 million in funding. The Second Tranche then closed on February 1, 2024, with AK Holdings providing further funding in the amount of $8.113 million (i.e. the balance of the $10.378 million that AK Holdings agreed to provide in the Second Tranche) and the individual investor providing an additional $0.122 million.
 
                                                            -5-
 
Then, in October 2025, AK Holdings agreed to provide up to $8 million in additional funding pursuant to the Note Purchase Agreement, and at that time provide $2.5 million of the additional funding.
2. Analysis. AK Holdings is entitled to dismissal of Capital’s claims with prejudice. Dismissal of a complaint under Rule 12(b)(6) “operates as a dismissal on the merits” and has “res judicata effect.” Saade v. Wilmington Trust, National Ass’n, 494 Mass. 1193, 1194 (2024), quoting Mestek, Inc. v. United Pacific Ins. Co., 40 Mass. App. Ct. 729, 731, rev. denied, 423 Mass. 1108 (1996).
2.1. Challenges to Validity of Contracts. In its amended complaint, Capital states that it brought its claims for breach of contract, and asserting that the AK Holdings seeks to charge an unlawfully usurious interest rate, in an effort to obtain a declaration that the Note Purchase Agreement, Option Agreement, and any future Merger Agreement are all “unenforceable by law” and an order “rescinding and/or invalidating” those agreements. In other words, as stated in ¶ 98 of the amended complaint, Capital “seeks to invalidate these [allegedly] flawed agreements and prevent AK Holdings from further exploiting the Company through their improper enforcement.”
The Note Purchase Agreement and the Option Agreement both state that they are governed by Massachusetts law.
2.1.1. Claims Barred by Covenant Not to Sue. Capital’s claims that the challenged agreements are invalid and unenforceable are barred by the Capital’s covenant not to sue.
By executing the Option Agreement, Capital agreed (in § 7.3) “not to commence or join in … any claim, derivative or otherwise,” against AK Holdings or APT “challenging the validity of, or seeking to enjoin the operation of,” any part or all of the Option Agreement, Note Purchase Agreement, or Merger Agreement.
This provision means what it says. It unambiguously bars Capital’s claims in this case other than its claim for aiding and abetting alleged breaches of fiduciary duty. Covenants not to sue like this one are enforceable. See generally Commerce Ins. Co. v. Szafarowicz, 483 Mass. 247, 265 (2019) (“contracts not to sue ... are usually valid”, quoting Spellman v. Shawmut Woodworking & Supply, Inc., 445 Mass. 674, 682 (2006)); MacFarlane’s Case, 330 Mass. 573, 576 (1953) (general rule is that rights “may be released or made the subject of a contract not to sue”).
 
                                                            -6-
 
Capital’s assertion that it is merely seeking to enforce the terms of the Option Agreement, which is expressly permitted under § 7.3, is without merit. The amended complaint could not be clearer in stating Capital’s aim to obtain a court order declaring the challenged agreements to be invalid and unenforceable.
The further argument that it would violate public policy to enforce the covenant not to sue with respect to the usury claim is also baseless. If Capital had a valid claim that the challenged agreements impose excessive interest in violation of G.L. c. 271, § 49—which it does not, for the reasons discussed below in § 2.1.3 of this decision—it could assert a claim seeking to reform the agreements and impose a lower, lawful interest rate without violating the covenant not to sue.
Under Massachusetts law, it  is  unlawful  to  charge  interest  of  more  than 20 percent annually on any “loan of money or other property” unless advance written notice is provided to the Attorney General. See G.L. c. 271, § 49(a) & (d). If a contract violates this statute, the Court may either declare the parties’ transaction void or reform their contract “to reduce the excessive rate charged to one that is legally permissible.” Begelfer v. Najarian, 381 Mass. 177, 187 (1980), quoting Beach Assocs., Inc. v. Fauser, 9 Mass. App. Ct. 386, 389 (1980). Capital has made clear in its pleading that it only seeks the first kind of relief, a declaration that the agreements are void and unenforceable, and has not sought reformation of the agreements.
The covenant not to sue only bars Capital from seeking a declaration that the challenged agreements are void because they violate the usury statute. It would not bar a different kind of derivative claim seeking to reform the agreements. Nor would it bar APT itself from seeking an order declaring the agreements void on the ground that they violate the usury statute.
Since the covenant not to sue permits APT to challenge the agreements under the usury statute, and also allows APT shareholders to bring a derivative claim seeking to enforce the usury statute so long as they do not seek a declaration that the agreements with AK Holdings are void, applying the covenant to the complaint filed by Capital does not violate public policy.
2.1.2. Breach of Contract Claim. The breach of contract claim in count I of the amended complaint would fail even if Capital were not bound by its covenant not to sue.
 
                                                            -7-
 
Capital asserts that AK Holdings breached the Option Agreement by failing to pay the $1 million premium required by § 2.3. But the facts alleged in the amended complaint make clear that Capital is not entitled to relief on that ground.[3]
As discussed above, the Note Purchase Agreement provided that “the amount of Consideration payable by the Lead Purchaser at the closing for the First Tranche shall be reduced by $1,000,000 to reflect the Company Option Premium (as defined in the Option Agreement).”[4] In other words, $1 million of the first payment by AK Holdings constituted payment in full of the Option Agreement premium, even though the entire amount paid by AK Holdings in September 2021 was also part of the principal amount that it has loaned to APT.
Capital’s claim to the contrary is inconsistent with the plain language of these contracts.
Since the Note Purchase Agreement and the Option Agreement are “interlocking documents” that are part of the same set of commercial transactions and are “interrelated in purpose,” the Court must read them “together to effectuate the intention of the parties.” Cf. Matthews v. Planning Bd.
 
--------------------------------------------
 
[3] The Complaint also asserts that AK Holding’s alleged failure to pay the required consideration means that the time for AK Holdings to exercise its option has expired and that the voting proxies transferred to AK Holdings have also expired. Those allegations do not need to be analyzed separately; they add nothing to the complaint because Capital has failed to assert a viable claim that AK Holdings did not pay the full consideration that was initially due.
[4] The conclusory allegation in the amended complaint that this was a “drafting error” does not state a viable claim. A contract may be reformed to correct a mutual mistake or scrivener's error where doing so is necessary “to effectuate the agreement intended by the parties to a contract.” Caron v. Horace Mann Co., 466 Mass. 218, 223 (2013) (reformation of contract for mutual mistake where contract language fails to capture parties’ agreement); accord Torrao v. Cox,  26 Mass. App. Ct. 247, 250 (1988) (reformation of contract for scrivener’s error). But the facts alleged in the amended complaint do not plausibly suggest that there was any drafting error. To the contrary, the complaint includes the Written Consent in which Capital expressly acknowledge that this was a term of APT’s contractual agreements with AK Holdings. In any case, Capital made clear during oral argument that it is not seeking reformation of the contracts between APT and AK Holdings.
 
                                                            -8-
 
of Gloucester, 72 Mass. App. Ct. 456, 463 (2008), quoting Striar v. American Medical Intern., Inc., 45 Mass. App. Ct. 87, 95 (1998).
The Court finds that the relevant provisions of the challenged agreements are unambiguous, and that their meaning is therefore a question of law that the Court may decide on the pending motion to dismiss. See Eigerman v. Putnam Investments, Inc., 450 Mass. 281, 287 (2007) (affirming dismissal); see also Berkowitz v. President & Fellows of Harvard College, 58 Mass. App. Ct. 262, 270 (2003) (whether language used in a contract “is ambiguous is also a question of law for the court”) (ordering dismissal). Even contracts that are a bit convoluted or hard to parse may be unambiguous. See Sullivan v. Southland Life Ins. Co., 67 Mass. App. Ct. 439, 443 (2006). And the fact that the parties disagree about how to read the Note Purchase Agreement and the Option Agreement does not automatically make them ambiguous either. See Indus Partners, LLC v. Intelligroup, Inc., 77 Mass. App. Ct. 793, 795 (2010).
Capital argues in the alternative that if AK Holdings was only required to pay $6.622 million at the September 2021 closing—and did not have to pay an additional $1 million to cover the Company Option Premium—then the Option Agreement is unenforceable because AK Holdings “provided no consideration for the benefits it obtained.” That assertion is also incorrect as a matter of law.
In September 2021, AK Holdings made a binding promise to pay $6.622 million to APT immediately, which it did. AK Holdings also promised in the Note Participation Agreement to provide further funding through a Second Tranche if APT met certain milestones.
The initial $6.622 million payment and the conditional promise to provide additional funding constituted more than sufficient consideration to support both the Note Purchase Agreement and the Option Agreement. Nothing more was required to make them both binding and enforceable contracts.
Though § 2.3 of the Option Agreement states that the $1 million Company Option Premium “represents full consideration” for the option, that is merely an acknowledgement that this portion of AK Holdings’ payment, standing alone, was sufficient consideration. It does not mean or establish that this was the only consideration for the Option Agreement.
To the contrary, since these two contracts “were executed together at the same time, as part of a single understanding,” it follows that the Note Purchase Agreement and the Option Agreement were both “supported by the same
 
                                                            -9-
 
consideration.” See Gomes v. Fagerberg, 10 Mass. App. Ct. 927, 927–928 (1980) (rescript) (where parties entered into purchase and sale agreement as to four lots, and at the same time entered into option agreement giving plaintiff right to purchase a fifth lot, the buyers’ promises in the P&S were good and sufficient consideration to support both contracts).
The promises made in and the payments made under the Note Purchase Agreement would have constituted sufficient consideration to make both contracts enforceable, even if the parties had not expressly agreed to treat $1 million out of the amount initially paid by AK Holdings as sufficient consideration for the Option Agreement; there was no need for AK Holdings to promise or pay separate consideration to make the Option Agreement enforceable. Id.; see also Shayeb v. Holland, 321 Mass. 429, 432 (1947) (option to purchase contained in commercial lease was “supported by the underlying consideration of the lease”). Thus, even if “a part of the consideration offered by” AK Holdings in the two contracts, “standing alone, might have been illusory,” as Capital contends (without basis), that would be “no objection to the sufficiency of the consideration” provided by AK Holdings’ other promises. See V & F.W. Filoon Co. v. Whittaker Corp., 12 Mass. App. Ct. 932 (1981) (rescript).
2.1.3. Usury Claim. The claim in count II that the challenged agreements require the payment of usurious interest that exceeds 20 percent per year in violation G.L. c. 271, § 49, would also fail even if Capital were not bound by its covenant not to sue.
In the amended complaint, Capital Artist alleges that although the stated annual interest rate in the Note Purchase Agreement is only 10 percent, the effective annual rate exceeds 20 percent annually because the interest compounds and APT may not pay off principal or interest early without permission from AK Holdings and the individual investor.
This claim fails because, as shown in AK Holdings’ memorandum, as a matter of arithmetic the effective annual interest rate will never rise to 20 percent before the notes mature in 2027. Capital does not dispute, and therefore implicitly concedes, this point in its opposition.
Rather than press its actual usury claim, Capital asserts two new arguments for why the Note Option Agreement can nonetheless be found to violate the usury statute. Both of these arguments fail as a matter of law.
 
                                                            -10-
 
First, Capital now contends that Merger Agreement provision stating that the Purchase Consideration to be paid if AK Holdings exercises its option shall be reduced by twice the principal amount due on the notes means that the total interest paid should be deemed to include the principal amount.
Not so.
The “doubling of principal” provisions have the effect of reducing the purchase price to be paid to acquire APT in the future. Such a price reduction would not be interest within the meaning of the usury statute. “[A] sale or lease of property cannot be usurious,” because parties are generally “free to buy and sell their property” for whatever price they choose. 9 Williston on Contracts § 20:12 (4th ed.)
The Merger Agreement provision stating that the full amount of Closing Date Company Indebtedness would be treated as repayment of indebtedness for Federal income tax purposes has no bearing on whether a price reduction equal to twice the outstanding principal counts as payment of extra interest for the purpose of the usury statute. “The form of the contract is not conclusive” of whether a transaction is usurious. Hopkins v. Flower, 256 Mass. 367, 372 (1926). Since “usury law … is based on concepts and policies wholly alien to the tax arena,” that a payment counts as deductible interest under the Internal Revenue Code does not mean that it is subject to usury laws that limit interest rates. See Beek v. Commissioner of Internal Revenue, 754 F.2d 1442, 1443–1444 (9th Cir. 1985).
Second, Capital now contends that $1 million of the First Tranche payment by AK Holdings should be deducted from the principal amount of those notes and upon repayment should instead be treated as interest, because of the provision stating that the First Tranche payment due from AK Holdings was reduced by $1 million to account for the Option premium amount. 
Once again, not so.
The amended complaint acknowledges that AK Holdings did in fact pay the entire $6.622 million that it agreed to pay to fund the First Tranche of notes, APT has in fact been able to use those monies to fund its operations, and if there is a merger then APT will repay the full principal amount of those notes through a reduction in the merger purchase price. Nothing about the structure of the agreed upon transactions would support a finding that $1 million of the
 
                                                            -11-
 
original amount loaned by AK Holdings counts as interest rather than principal under the usury statute.
2.1.4. Challenge to Merger Agreement. The allegations in the amended complaint that the Merger Agreement is unenforceable because it has not been executed, does not include a final purchase price or related exhibits, and was not executed within 60 days of the stockholders’ consents do not state a viable claim for declaratory relief.
First, there is no actual controversy about whether the Merger Agreement is enforceable now or in the future. It is undisputed that the Merger Agreement is not enforceable now, because AK Holdings has not exercised its exclusive option and as a result the parties have not finalized and executed the Merger Agreement. Since there is no actual controversy between the parties about whether the Merger Agreement can be enforced at this time, this inchoate claim for declaratory relief under G.L. c. 231A must be dismissed. See Alliance, AFSME/SEUI, AFL-CIO, v. Commonwealth, 425 Mass. 534, 537-539 (1997).
Second, the Option Agreement is enforceable even though it did not specify the price to be paid under the Merger Agreement if AK Holdings exercises its option to purchase APT, because the agreed-upon form of the Merger Agreement establishes a specific method and formula for calculating the final price, by starting with a Base Consideration of $61 million and making certain adjustments that can readily be calculated in the future by complying with the Merger Agreement’s provisions. See Lafayette Place Assocs. v. Boston Redev. Auth., 427 Mass. 509, 517–518 (1998) (option to purchase property held enforceable because it provide formula to determine price). “If parties specify formulae and procedures that, although contingent on future events, provide mechanisms to narrow present uncertainties to rights and obligations, their agreement is binding.” Id. at 518.
Third, Capital’s assertion that the APT stockholders’ consents expired after  60 days pursuant to 8 Del. C. § 228 misses the point. The written consents by Capital and the other stockholders, by their terms, were fully effective as of September 1, 2021, and thus were in effect when the Note Purchase Agreement and Option Agreement were executed. Since Capital is a party to the Option Agreement, it is bound by its terms, and thus is contractually bound to participate in a merger transaction if AK Holdings were to exercise its option. Capital has not shown that any further written consent of the stockholders would be required at that time.
 
                                                            -12-
 
2.2. Aiding and Abetting Claim. The parties agree that  the  claim  against AK Holdings for allegedly aiding and abetting breaches of fiduciary duty by the AK Directors is governed by Delaware law, because APT is a Delaware corporation. See Harrison v. NetCentric Corp., 433 Mass. 465, 472 (2001).
To state a viable claim for aiding and abetting a breach of fiduciary duty, Capital must allege facts plausibly suggesting: “(1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, ... (3) knowing participation in that breach by the defendants, and (4) damages proximately caused by the breach.” In re Mindbody, Inc., Shareholder Litig., 332 A.3d 349, 389 (Del. 2024), quoting Malpiede v. Townson, 780 A.2d 1074, 1096 (Del. 2001).
The Court will dismiss this claim because the facts alleged in the amended complaint do not plausibly suggest that the AK Directors breached their duties of loyalty or care. If there is no underlying breach of fiduciary duty, then “the aiding and abetting claim fails.” In re Wayport, Inc. Litig., 76 A.3d 296, 323 (Del. Ch. 2013); accord GB-SP Holdings, LLC v. Walker, 2024 WL 4799490, at *51 (Del. Ch. Nov. 15, 2024).
The amended complaint asserts that the Note Purchase Agreement and Option Agreement were not in APT’s best interest—even though Capital expressly consented to both contracts at the time.
But the amended complaint concedes that the AK Directors did not join APT’s board until after those contracts were executed. Since the AK Directors were not board members at the time, they could not have breached any fiduciary duty owed to APT (and thus AK Holdings could not have aided or abetted any such breach) in connection with APT’s negotiation, approval, and acceptance of the Note Purchase Agreement and Option Agreement with AK Holdings.
The only allegations in the amended complaint about purported acts or omissions by the AK Directors after they joined the APT board is the assertion (in ¶¶ 55 and 96) that they “refused” to participate in “meaningful discussions” about obtaining funding for APT other than from AK Holdings. Though Capital cites other paragraphs in the amended complaint in support of its aiding and abetting claim, none of those paragraphs allege any other act or omission by the AK Directors.
Capital’s contention in its written opposition that the amended complaint “identifies specific affirmative actions taken by the AK Directors to the detriment of Active Protective” is false. It does not. Though Capital now asserts
 
                                                            -13-
 
that “the AK Directors used their Board seats to block alternative fundraising or capitalization,” it fails to identify any factual allegations to that effect anywhere in the amended complaint.
The allegation that the AK Directors should have discussed alternative funding sources fails to plausibly suggest that they breach any fiduciary duty.
The amended complaint expressly alleges (in ¶ 57) that APT is contractually barred “from approaching additional investors or securing other financing on terms that might be more favorable than those mandated by AK Holdings or taking any other action in connection with entering into alternative financing transactions without the consent of AK Holdings.” Capital is bound by this allegation. See G.L. c. 231, § 87; Adiletto v. Brockton Cut Sole Corp., 322 Mass. 110, 112 (1947).
It follows that the limited allegations regarding the AK Directors do not plausibly suggest that they did anything to violate their duty of loyalty. Since APT is contractually obligated to comply with the Note Purchase Agreement and Option Agreement, the AK Directors could not have breached their duty of loyalty by failing to engage in “meaningful discussions” about pursuing alternative financing that would cause APT to dishonor its contracts. See Hokanson v. Petty, 2008 WL 5169633, at *6 (Del. Ch. Dec. 10, 2008) (dismissing claim that directors breached duty of loyalty by executing merger agreement as required by prior option agreement). “[T]he fiduciary status of directors does not give them Houdini-like powers to escape from valid contracts.” Wagner v. BRP Grp., Inc., 316 A.3d 826, 862 (Del. Ch. 2024), quoting Frederick Hsu Living Trust v. ODN Holding Corp., 2017 WL 1437308, at  *23 (Del. Ch. Apr. 14, 2017).
The facts alleged in the amended complaint also do not plausibly suggest that the AK Directors breached their duty of care. Nothing in the amended complaint suggests that the AK Directors had any duty to engage in discussions about subverting APT’s contractual obligations to AK Holdings. “[I]f the directors were under no duty to act, then they could not have acted in bad faith by not acting.” In re Walt Disney Co. Derivative Litig., 907 A.2d 693, 773 (Del. Ch. 2005), aff'd, 906 A.2d 27 (Del. 2006). Nor do the facts alleged in the amended complaint suggest that the AK Directors were grossly negligent in failing to discuss ways to undue APT’s contracts with AK Holdings. Even if the AK Directors were somehow negligent, “ordinary negligence is insufficient to
 
                                                            -14-
 
constitute a violation of the fiduciary duty of care” owed by a corporation’s directors. Id. 907 A.2d at 760.
In sum, since the allegations of the amended complaint do not plausibly suggest that the AK Directors violated their fiduciary duties to APT, Capital has failed to state a viable claim against AK Holdings for aiding and abetting a breach of fiduciary duty.
ORDER
Defendant’s motion to dismiss (docket no. 19) is allowed. Final judgment shall enter providing that Plaintiff shall take nothing and obtain no relief on its claims, and dismissing all claims with prejudice.
/s/Kenneth W. Salinger Justice of the Superior Court
May 6, 2026